STATE OF NORTH CAROLINA v. FREDERICK STANLEY

No. 113

(Filed 26 June 1975)

1. Criminal Law § 161— failure to bring forward assignments of error — review by Court

The Supreme Court may exercise its rarely used general supervisory authority and elect to consider whether the evidence in the case disclosed entrapment as a matter of law, even though there were no assignments of error properly before the Court where defendant did not raise the question of entrapment in the Court of Appeals and where defendant failed to argue, cite authority, or bring forward any of the matters upon which he based his petition for *certiorari.*

2. Criminal Law § 7— entrapment defined

Entrapment is the inducement of one to commit a crime not contemplated by him, for the mere purpose of instituting a criminal prosecution against him.

**3. Criminal Law § 7; Narcotics § 4— inducement to buy narcotics — entrapment as a matter of law**

In a prosecution for felonious possession of a controlled substance with intent to distribute and felonious distribution, the trial court erred in failing to allow defendant's motion to dismiss on the ground that the evidence disclosed entrapment as a matter of law where such evidence tended to show that a 28 year old police officer posing as an army sergeant ingratiated himself into the confidence and affection of the 16 or 17 year old defendant for the purpose of using him to find and buy drugs, the officer accomplished his purpose by seeking defendant's companionship, continually calling defendant's home, and allowing defendant to drive his automobile, during this time he assured defendant's troubled parents that he would "look after their son," and after establishing the relationship of a "big brother" with defendant, the police officer "got him to make more than one drug buy for me."

ON *certiorari* to review the decision of the Court of Appeals, 24 N.C. App. 323, 210 S.E. 2d 496, which found no error in the trial before *Tillery, J.,* 11 February 1974 Session of NEW HANOVER County Superior Court.

Defendant was tried upon separate bills of indictment charging him with felonious possession of a controlled substance with the intent to distribute and felonious distribution of a controlled substance. The bills of indictment were consolidated for trial without objection, and defendant entered pleas of not guilty to both charges.

The evidence for the State tended to show the following facts:

W. A. Lee, a member of the New Hanover Sheriff's Department assigned to the Inter-Agency Drug Squad, testified that on the evening of 4 April 1973 about 8:00 to 8:15 p.m., he picked up defendant and Charles Shelton in the vicinity of the New Hanover High School. Defendant requested that he take them to a concert at the college and stated that he had a friend there from whom he could obtain "acid." When they arrived at the college, defendant and Shelton left for a few minutes and, when they returned, told him that they could get two "hits" of LSD for him for six dollars. He thereupon gave defendant six dollars, and defendant returned with two purple tablets. The witness Lee stated that he took defendant and Shelton to Wrightsville Beach and thereafter delivered the drugs to the Sheriff's Department. It was stipulated that subsequent tests revealed the substance delivered to the witness to be lysergic acid diethylamide (LSD).

On cross-examination Lee testified that he was twenty-eight years old and that on 4 April 1973, the date of the offense, defendant, a student at New Hanover High School, was sixteen or seventeen years old. He had known defendant since March, 1973, and had associated with him for approximately three or four weeks prior to the commission of the offenses charged. He told defendant that he was a sergeant in the army and was attached to the Coast Guard station on Carolina Beach Road. He actually was a narcotics undercover agent who solicited and gained the confidence of people who might have drugs or be able to lead him to drugs. He had at his disposal a blue Pinto automobile and a Volkswagen van. He further testified that he and defendant became friends, and the witness went to defendant's home on "perhaps three occasions, picked him up after school, and let him ride around with me, and carried him places. I wanted him to help me find drugs. I wanted him to help me find any group at the high school or related groups that had anything to do with drugs." He met a number of defendant's friends, associated with them, and transported them to various places "over a fairly lengthy period of time." During this same period of time, the witness was "close enough" with defendant to allow defendant to drive his automobile or bus. With regard to his associations with defendant, the witness further testified:

> I visited his home and his brother's home. I would take him home after we had kicked around at night, and would pick him up from school, his home, and his brother's home. I recall making two calls to him at his father's home, and I helped him move from his father's home to his brother's home.

> On numerous occasions when he was living at his brother's home, I would carry him home at night; it may have been as late as two, three, or four o'clock in the morning, but I don't recall. Often, I would ask him where I could find drugs and buy drugs.

> He looked at me as a big brother as I was over ten years older than he was, and he believed I was a Sergeant in the Army. On occasion when I picked him up from his brother's house, I would talk to his brother and sister-in-law for hours. I knew his brother, his sister-in-law, his mother, and his father. His father told me that he was worried about the boy and asked me to look after him, and I told him that I would look after Frederick Stanley.

State v. Stanley

I got him to make more than one drug buy for me. He would go in and buy the stuff from people as I was well-known. I would never get out of the van to make a purchase because I had been in the Uniformed Division for two years. I did not know who [sic] he purchased drugs from, but I supplied the money for the purchases.

Two occasions that he purchased for me it turned out that they were not real drugs, but imitations. Stanley didn't know whether the stuff was drugs or not.

Officer Lee was the only State's witness, and at the close of his testimony defendant moved to dismiss both charges. The motion to dismiss was denied.

Defendant's evidence, in substance, was as follows:

Lewis Stanley, defendant's father, testified that on the day of the alleged crime, defendant was living with him and that Lee had previously visited in the witness's home approximately three times. Lee made telephone calls to his home and talked with defendant's mother. Lee would take his son places and bring him back home. The witness had conversations with Lee, and Lee told him that he was a sergeant in the army attached to the Coast Guard station. The last time Lee was in his home was on the occasion when he helped defendant move. On this occasion the witness told Lee that he was worried about his son and asked Lee to look out for him. Mr. Stanley further testified that "it was my opinion that he was a bit old for my son to be going around with, and I asked my son to stop going around with him, and my son told me that Mr. Lee was the best friend he had. Mr. Lee had a lot more influence over my son than I did."

Mabel Stanley, defendant's mother, testified that she received "perhaps eight or nine" telephone calls from Mr. Lee concerning his associations with her son. She stated that she asked Lee "to look out for my son on several occasions, and he told me that he would look after him." She further testified that since her son stopped associating with Lee, "his behavior has improved, and he has moved back home. Further, he is working full time, and takes a lot of interest in his home life." She stated that after Lee became friends with her son, he became "more rebellious and harder to manage, and he went from job to job and dropped out of school."

State v. Stanley

On cross-examination, the witness testified that defendant left home and stayed with his brother for approximately three weeks. She further stated that although during this general period of time her son occasionally left home, he had been staying at home and doing well for a long time prior to his arrest for this charge.

On redirect examination she said that although the offense charged was alleged to have happened on 4 April 1973, her son was not arrested until 6 July 1973.

Roger Stanley, a brother of defendant, testified that during the spring of 1973 his brother moved into his home and while there had frequent associations with Lee. He further stated that Lee came to his home one to three times weekly while his brother was staying there. On occasion, Lee would keep his seventeen-year-old brother out almost all night. He testified that Lee spent a great deal of time with, and took much interest in, his brother, "and I knew that my brother admired him and thought an awful lot of him."

Edith Stanley, a sister-in-law of defendant, stated that she and her husband had a conversation with Lee concerning how late defendant was staying out at night and informed Lee that defendant had told them that he and Lee had been out drinking beer, and further that on occasion defendant had come home in a drunken condition. It was her impression that Lee "was one of the few people who could really talk to my brother-in-law."

Defendant, testifying in his own behalf, stated that on 4 April 1973 he was seventeen years of age. He further related that when they first met, Lee asked him whether he knew anybody from whom Lee could obtain narcotics. That evening, when they went to Southport, defendant smoked some marijuna furnished by Lee. During the succeeding weeks he and Lee were became frequent companions, and during some weeks Lee would pick him up from school almost every day. With regard to this relationship, defendant stated:

> During our conversations, he constantly talked about the subject of drugs, and kept asking me where I could get drugs for him, and on several occasions we went looking for drugs, but were unable to find them.

> I introduced Mr. Lee to many of my friends, including four boys and two girls, whom he tried to get to help him obtain drugs. These friends were ages 15 to 18 years of age.

State v. Stanley

During this period I was with him almost constantly, and almost every place that I went was with Mr. Lee. During this time, I was having difficulty with my parents, and it seemed that I just could not talk with them.

I looked at Mr. Lee like a brother, in fact, closer than my brother. The reason that I thought that a man of that age who was an Army sergeant would take up with a kid like myself was because he was new in town and he didn't have any friends, and was looking for friends. We became very friendly and very good friends, and I started thinking of him as a big brother, and he treated me like a brother.

On the night of 4 April 1973 Lee picked up defendant and Shelton, and during their conversation he asked them, "Do you know where we can cop any drugs at?" Defendant informed him that he did not know of any place at this time, but Shelton stated that there was "someone out at the college that might have them."

They proceeded to the college, where they located the person who Shelton thought might have some drugs. This person informed them that LSD would be $2.50 per "hit." They obtained $5.00 from Lee, bought the LSD, and delivered it to him. Lee put the drugs in his shirt pocket and shortly thereafter let him and Shelton out.

Defendant further testified:

If Mr. Lee hadn't carried me out there, and hadn't wanted the drugs, I would not have had any interest in going there and in getting them. I have smoked some marijuana, but I have never been on hard drugs. The only reason that I was trying to get these drugs was as a favor for Mr. Lee.

On cross-examination defendant stated that prior to meeting Lee, he had used marijuana perhaps once every two weeks but that he had not used LSD and had never used a needle. He said that at the time he knew Lee he dressed like a hippie and that the last time he used marijuana was before he moved back with his parents. He was on probation for a conviction of possession of marijuana. On redirect examination he said that "most of the kids at school know something about drugs, and most of them know something about where you can obtain them."

Gene Wright, aged nineteen, testified that he had seen defendant and Lee together on many occasions and had ridden with them about a dozen times. On one occasion Lee allowed him and defendant to smoke marijuana cigarettes which they found in the ashtray of Lee's automobile.

Edcil Wright, aged fifteen, testified that he had seen Lee on many occasions, and on one occasion he allowed him, defendant, and his brothter Gene to smoke marijuana cigarettes found in the ashtray of his vehicle.

Lee, recalled, testified that he never gave any of the young people marijuana.

The jury returned a verdict of guilty as to the charge of felonious possession with intent to distribute and not guilty as to the charge of distribution of a controlled substance. Defendant appealed. The Court of Appeals found no error in the trial, and we allowed defendant's petition for writ of *certiorari* on 4 March 1975.

*Attorney General Rufus L. Edmisten, by Assistant Attorneys General William F. O'Connell and William Woodward Webb, for the State.*

*Harold P. Laing for defendant appellant.*

BRANCH, Justice.

[1]   At the threshold of this appeal we are confronted with the question of whether any assignments of error are properly before us for review. Justice Lake clearly stated one of the rules which governs decision of this question in *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353:

> When this Court, after a decision of a cause by the Court of Appeals and pursuant to the petition of a party thereto as authorized by G.S. 7A-31, grants certiorari to review the decision of the Court of Appeals, only the decision of that Court is before us for review. We inquire into proceedings in the trial court solely to determine the correctness of the decision of the Court of Appeals. Our inquiry is restricted to rulings of the Court of Appeals which are assigned as error in the petition for certiorari and which are preserved by arguments or the citation of authorities with reference thereto in the brief filed by the petitioner in this Court, except in those instances in which

we elect to exercise our general power of supervision of courts inferior to this Court. Our review of a decision by the Court of Appeals upon an appeal from it to us as a matter of right, pursuant to G.S. 7A-30, which means of review might have been pursued by the defendant in this action, is similarly limited.

Further, it is well recognized that assignments of error not set out in an appellant's brief, and in support of which no arguments are stated or authority cited, will be deemed abandoned. *State v. Bumgarner,* 283 N.C. 388, 196 S.E. 2d 210; *State v. Felton,* 283 N.C. 368, 196 S.E. 2d 239; *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336; *State v. Jenerett,* 281 N.C. 81, 187 S.E. 2d 735; *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22; *State v. Freeman,* 280 N.C. 622, 187 S.E. 2d 59; *Branch v. State,* 269 N.C. 642, 153 S.E. 2d 343; *State v. Spears,* 268 N.C. 303, 150 S.E. 2d 499. In the case *sub judice* appellant did not raise the question of entrapment in the Court of Appeals.

By his petition for *certiorari,* appellant sought review of the rulings of the Court of Appeals relating to the impropriety of the solicitor's cross-examination, to the validity and constitutionality of the narcotics statutes, and to the question of whether possession of a controlled substance is a lesser included offense of the crime of possession of a controlled substance with intent to distribute. Nevertheless, in his brief filed with this Court, appellant failed to argue, cite authority, or bring forward, even by reference, any of the matters upon which he based his petition for *certiorari.* Thus, applying the above-stated rules, we conclude that nothing is properly before us for review unless we elect to exercise our general supervisory powers.

This Court will not hesitate to exercise its rarely used general supervisory authority when necessary to promote the expeditious administration of justice. N. C. Const. Art. IV, § 12(1); *Brice v. Salvage Co.,* 249 N.C. 74, 105 S.E. 2d 439; *Terrace, Inc. v. Indemnity Co.,* 243 N.C. 595, 91 S.E. 2d 584. Under unusual and exceptional circumstances we will exercise this power to consider questions which are not properly presented according to our rules. *State v. Hewett,* 270 N.C. 348, 154 S.E. 2d 476. Because of the exceptionally unusual facts of this case relating to entrapment, we do not believe that defendant should be deprived of our consideration of this defense because of noncompliance with our rules. We therefore elect to

consider the question of whether the evidence in this case discloses entrapment as a matter of law.

[2]    Entrapment is "the inducement of one to commit a crime not contemplated by him, for the mere purpose of instituting a criminal prosecution against him." 21 Am. Jur. 2d. *Criminal Law* § 143; *State v. Campbell,* 110 N.H. 238, 265 A. 2d 11. *See* R. Perkins, Criminal Law 1031 *et seq.* (2d ed.). *See generally* Annot., 62 A.L.R. 3d 110; Annot., 22 A.L.R. Fed. 731. In the case before us, the trial judge submitted the question of entrapment to the jury; nevertheless, there remains the question of whether the trial judge erred in failing to allow defendant's motion to dismiss on the ground that the uncontradicted evidence disclosed entrapment as a matter of law.

We note that the question here presented is an evidentiary question, not one of constitutional dimensions. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed. 2d 366; *Smith v. State,* 258 Ind. 415, 281 N.E. 2d 803.

Apparently, the first case in this State to consider a defense of entrapment, although not specifically calling the defense by that name, is *State v. Smith,* 152 N.C. 798, 67 S.E. 508. In that case a law enforcement officer furnished to a third person money with which to buy liquor and also paid the third person for his services. Under orders from the law enforcement officer, the police agent and a city policeman went to the defendant and purchased intoxicating liquor from him "with the view of having him indicted and punished." Upon his conviction, defendant appealed and presented the sole question of whether the conduct on the part of the law enforcement officer was a bar to his prosecution. In rejecting that contention, this Court stated: " . . . [A]s to prosecution for offenses, not against individuals, but against the public, like the present, it is no defense that the illegal sale was made to a party who bought not for his own use, but to aid in convicting the seller. It is not the motive of the buyer, but the conduct of the seller which is to be considered." To similar effect, *see State v. Hopkins,* 154 N.C. 622, 70 S.E. 394.

The defense of entrapment was first recognized as such in *State v. Love* and *State v. West,* 229 N.C. 99, 47 S.E. 2d 712. There the Court, rejecting defendants' contentions that the evidence disclosed entrapment and that the trial judge should have granted motion as of nonsuit, held that in order for the

defense of entrapment to exist, there must be more than trickery, fraud, or deception on the part of the law enforcement officers. There must be trickery, fraud, or deception *"practiced upon one who entertained no prior criminal intent."* (Emphasis supplied.) However, in a dictum statement, the Court noted its concern for overreaching police activities:

> Considerations of the purity and fairness of the Courts and the agencies created for the administration of justice gravely challenge the propriety of a procedure wherein the officers of the State envisage, plan and instigate the commission of a crime and proceed to punish it on the theory that a facile compliance with the officer's invitation confirms the accuracy of the suspicion of an unproved criminal practice,—for which the defendant is in reality punished.

In *State v. Burnette*, 242 N.C. 164, 87 S.E. 2d 191, the State's evidence tended to show that after receiving from the defendant several telephone calls in which he obscenely stated that "he wanted her," the prosecuting witness reluctantly consented to the police officers' request that she allow one of them to conceal himself in her automobile and meet the defendant at a place designated by him. Upon going to this place, she unlocked the door of her automobile, and the defendant entered the car, lunged across the seat, grabbed her, and started to put his hands around her throat. The defendant was then taken into custody by the police officers and charged with assault with intent to commit rape. The evidence showed that there were several other abortive attempts to trap the defendant in the same manner before he was finally apprehended. At trial and upon appeal, the defendant contended that the case against him should have been nonsuited because the State's evidence revealed that he was a victim of entrapment. This Court rejected the defense of entrapment and speaking through Justice Parker (later Chief Justice), in part, stated:

> It is the general rule that where the criminal intent and design originates in the mind of one other than the defendant, and the defendant is, by persuasion, trickery or fraud, incited and induced to commit the crime charged in order to prosecute him for it, when he would not have committed the crime, except for such incitements and inducements, these circumstances constitute entrapment and a valid defense. *S. v. Marquardt*, 139 Conn. 1, 89 A. 2d 219, 31 A.L.R. 2d 1206 and Anno. p. 1212; *Butts v. U. S.*, 273

Fed. 35, 18 A.L.R. 143 and Anno. p. 149; *Robinson v. U. S.,* 32 Fed. 2d 505, 66 A.L.R. 468 and Anno. p. 482; *Sorrells v. U. S.,* 287 U.S. 435, 77 L.Ed. 413, 86 A.L.R. 249 and Anno. 265; *People v. Finkelstin,* 98 Cal. App. 2d 545, 553, 220 P. 2d 934; *Falden v. Commonwealth,* 167 Va. 549, 555, 189 S.E. 329; *S. v. Jarvis,* 105 W.Va. 499, 500, 143 S.E. 235; 22 C.J.S., Criminal Law, pp. 99-100; 15 Am. Jur., Criminal Law, Sec. 336. See also *S. v. Love; S. v. West,* 229 N.C. 99, 47 S.E. 2d 712; *S. v. Godwin,* 227 N.C. 449, 42 S.E. 2d 617.

In the leading case of *Butts v. U. S., supra, Sanborn, C. J.,* said for the Court: "The first duties of the officers of the law are to prevent, not to punish, crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it."

A clear distinction is to be drawn between inducing a person to commit a crime he did not contemplate doing, and the setting of a trap to catch him in the execution of a crime of his own conception. *S. v. Jarvis, supra; S. v. Mantis,* 32 Idaho 724, 187 P. 268; 15 Am. Jur., Criminal Law, p. 24; 22 C.J.S., Crim. Law, pp. 100-101.

*Accord: State v. Coleman,* 270 N.C. 357, 154 S.E. 2d 485; *State v. Caldwell,* 249 N.C. 56, 105 S.E. 2d 189; *State v. Kilgore,* 246 N.C. 455, 98 S.E. 2d 346; *State v. Boles,* 246 N.C. 83, 97 S.E. 2d 476. *See* 21 Am. Jur. 2d *Criminal Law* § 144.

*Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848, provides guidance for our decision in instant case. In *Sherman* the evidence tended to show that a government informer first met the defendant at a doctor's office where both were being treated as narcotic addicts. After several meetings, during which the defendant and the informer discussed mutual problems, the informer asked the defendant whether he knew of a good source of narcotics. He explained that the treatment was not working with him and that he needed a source of supply so that he could return to the use of drugs. Initially, the defendant tried to avoid this question, but after a number of requests predicated upon the informer's suffering, the defendant finally acquiesced. The defendant thereafter obtained narcotics which he shared with the informer. He also shared the expense of obtaining the narcotics. After several such transactions the informer advised agents of the Bureau of Narcotics

that he had another seller, the defendant. After government agents observed the defendant give narcotics to the informer in return for money supplied by the government, the defendant was arrested.

The factual issue of entrapment was raised at the trial and submitted to the jury, apparently under adequate instructions. A conviction resulted, and the defendant was sentenced to a term of imprisonment of ten years. The Court of Appeals for the Second Circuit affirmed. 240 F. 2d 949.

On *certiorari*, the Supreme Court of the United States reversed and held that the evidence established entrapment as a matter of law. The Court emphasized that it was not choosing between conflicting testimony but was reaching its conclusion from "the undisputed testimony of the prosecution's witnesses." Reaffirming its prior decision in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, the Court stated the problem which ensues whenever entrapment is raised in a criminal case:

> . . . The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "a different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U.S., at 442. Then stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

However, the fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment. Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials. (Emphasis supplied.) See 287 U.S., at 441, 451. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap

State v. Stanley

for the unwary criminal. The principles by which the courts are to make this determination were outlined in *Sorrells*. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. See 287 U.S., at 451.

Focusing on the government's contention that the petitioner evinced a "ready complaisance" to accede to the informer's request, the Court emphasized the lack of evidence that the defendant himself was in the trade. The Court noted that no narcotics were found in the defendant's apartment when it was searched after his arrest and that there was no significant evidence that the defendant made a profit on any sale to the informer. The Court also stated, rather significantly, that "[t]he Government's characterization of petitioner's hesitancy to [the informant's] request as a natural wariness of the criminal cannot fill the evidentiary void." The Court further stated that the fact that petitioner had two previous convictions, one a nine-year-old sales conviction and the other a five-year-old possession conviction, were insufficient to prove that petitioner "had a readiness to sell narcotics at the time [the informant] approached him, particularly when we must assume from the record he was trying to overcome the narcotics habit at the time."

The Court emphasized its concern with the undesirable aspects of this sort of procedure by a police agent:

The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. Selecting the proper time, the informer then tells the government agent. The setup is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this.

For other cases in which the Courts have found entrapment as a matter of law, *see United States v. Bueno*, 447 F. 2d 903

(5th Cir.), *cert. denied,* 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed. 2d 411; *State v. McKinney,* 108 Ariz. 436, 501 P. 2d 378; *Rogers v. State,* 277 So. 2d 838 (Fla. App.) ; *People v. Dollen,* 53 Ill. 2d 280, 290 N.E. 2d 879; *Jones v. State,* 285 So. 2d 152 (Miss.).

The rule governing the application of the defense of entrapment as a matter of law is clearly and concisely stated by the New Hampshire Supreme Court in *State v. Campbell, supra.* We quote from that case:

> Ordinarily, if the evidence presents an issue of entrapment it is a question of fact for the jury to determine. 1 Whartons Criminal Law and Procedure, s. 132 (supp.) ; *United States v. Baker,* 373 F. 2d 28; *Rush v. United States,* 370 F. 2d 520; *United States v. Landry,* 257 F. 2d 425. The court can find entrapment as a matter of law only where the undisputed testimony and required inferences compel a finding that the defendant was lured by the officers into an action he was not predisposed to take. *Cline v. United States,* 20 F. 2d 494; *Morei v. United States,* 127 F. 2d 827; *Sherman v. United States,* 356 U.S. 369, 2 L.Ed. 2d 848, 78 S.Ct. 819. . . .

[3]  The uncontradicted State's evidence in instant case discloses that a twenty-eight-year-old police officer posing as an army sergeant ingratiated himself into the confidence and affection of the sixteen- or seventeen-year-old defendant for the purpose of using him to find and buy drugs. He accomplished his purpose by seeking defendant's companionship, continually calling defendant's home, and allowing defendant to drive his automobile. During this time he assured defendant's troubled parents that he would "look after their son." After establishing the relationship of a "big brother" with defendant, the police officer "got him to make more than one drug buy for me." Clearly the acts described in the bills of indictment in this case were committed by this young defendant at the instance of, and as a result of the persuasion of, Officer Lee. We find nothing in this record which tends to show that the crime of which defendant stands convicted was conceived in defendant's mind. To the contrary, the State's uncontradicted evidence shows that the criminal design and intent to commit this offense originated in the mind of Officer Lee and that he, by fraud and persuasion, induced defendant to commit the criminal act. It is true that defendant had at the time of the trial been convicted of possession of marijuana. However, the record fails to indicate

State v. Stanley

whether this offense took place before or after his association with Officer Lee. In any event, a conviction of possession of marijuana would not indicate a predisposition to commit the crime of which he stands convicted. *Sherman v. United States, supra; Rogers v. State, supra.*

Our conclusion in this case is buttressed by G.S. 90-113.1(c), which provides that no liability for violation of the Controlled Substances Act shall be imposed upon any duly authorized officer engaged in the lawful enforcement of its provisions. It would violate every precept of fair play and fundamental justice to allow a law enforcement officer to benefit from this statutory protection and at the same time prosecute his youthful agent, who at his instance violated the provisions of the act.

We do not wish to leave any impression that we oppose the necessary undercover activities of law enforcement officers. We are too well aware of the destructive effect of the drug traffic upon the health and moral fiber of this country to place an unnecessary limitation upon those who seek to enforce our drug laws. The methods of the drug trafficker are so clandestine and insidious that it becomes necessary for the State to use undercover agents, who may rightfully furnish to the plyers of this trade opportunity to commit the crime in order that they may be apprehended. It is only when a person is induced by the officer to commit a crime which he did not contemplate that we must draw the line. Here the State's uncontradicted evidence and all the legitimate inferences arising therefrom compel a finding as a matter of law that defendant was fraudulently persuaded and induced to commit the criminal act charged. There was not a scintilla of evidence to show any predisposition on the part of defendant feloniously to possess a controlled substance with intent to distribute.

We therefore hold that this defendant was a victim of entrapment and that the trial judge erred by denying his motion to dismiss.

The judgment of the Court of Appeals is reversed, and the case is remanded to that Court with direction that it remand the case to the Superior Court of New Hanover County with order to vacate the judgment in case No. 73CR10676 (felonious possession of a controlled substance with intent to distribute) and to dismiss the indictment against defendant in that case.

Reversed and remanded.