STATE OF NORTH CAROLINA v. BRYAN BOARD

No. 7519SC1054

(Filed 19 May 1976)

1. Criminal Law § 7; Narcotics § 4— possession and sale of MDA — no entrapment as matter of law

In a prosecution for possession with intent to sell and sale of MDA, the evidence did not disclose as a matter of law that defendant was entrapped by law enforcement officers into committing the criminal offenses charged, since the State's evidence raised an inference that a paid SBI informer used his position as basketball coach, confidant, and friend of defendant to induce defendant to commit offenses which he did not otherwise contemplate committing, but the State's evidence also raised the inference that the SBI agents and informer merely afforded defendant the opportunity to commit offenses which he was predisposed to commit and which actually originated in defendant's mind.

2. Criminal Law § 114— jury instructions — expression of opinion on witness's credibility

In a prosecution for possession with intent to sell and sale of MDA where defendant's entire defense was that he was entrapped by SBI informer Casey, the credibility of the testimony of Casey was critical to defendant's defense, and the trial court erroneously expressed an opinion on the witness's credibility when he stated to the jury, ". . . that a person such as Ernie Casey who honestly and in good faith carried out the instructions of a police officer and who

State v. Board

acts for the exclusive purpose of assisting in law enforcement does not violate the law."

APPEAL by defendant from *Braswell, Judge.* Judgment entered 24 October 1975 in Superior Court, ROWAN County. Heard in the Court of Appeals 7 April 1976.

The defendant, Bryan Board, was charged in separate indictments, proper in form, with possession with intent to sell and sale of MDA (a Schedule I controlled substance) on 8 February and possession with intent to sell and sale of MDA on 14 February 1975. He pleaded not guilty to each charge, and the State offered evidence tending to show the following:

Earnest Casey, age twenty, and the defendant, age seventeen, were friends. Casey had known the defendant almost all his life, having gone to school with him and having participated in activities with him. The defendant played for the basketball team at the church he and Casey attended, and Casey coached the team.

Casey was an employee of North Carolina National Bank in January 1975 when SBI Agent Barry Lee approached him concerning working with Lee in investigating drug traffic in China Grove, North Carolina, where Casey lived. He agreed to help Lee because he was trying to start a career in law enforcement. Casey testified: "After talking to Mr. Lee, I went around the China Grove area, talked with several different people and on my own talked to find out if there was any drug traffic in that area." As a result of his investigation, he introduced the defendant to SBI Special Agent Adcox on 7 February 1975. They met in the Methodist Church parking lot in China Grove at about 8:00 p.m. and agreed to return there between 9:15 and 9:30 p.m. when Adcox was going to pick up a gram of MDA from the defendant. Adcox gave the defendant $50.00 to purchase the MDA and they left. The meeting never took place, though, because, as Casey was driving with Adcox back to the parking lot at about 9:30, he was stopped by the local police.

The following morning Casey talked with the defendant and arranged for Casey and Adcox to meet him at his house that afternoon. When they arrived at the house, Casey went into the house and into the defendant's room. The defendant showed him "a white baggy with a white powdery substance

in it" and Casey told him to carry it out to Adcox who was still in the car, which he did. Casey remained in the house to make a phone call.

Adcox testified that the defendant came out and gave him the baggy which contained three-quarters of a gram of MDA. The defendant also gave him $15.00 in change saying that he had not been able to purchase a full gram. They discussed drugs generally for a few minutes, the defendant relating that he had tried speed and had purchased drugs in the past. Adcox asked the defendant if he could obtain other drugs for him. The defendant discussed the possibility of buying an ounce of MDA from the Moores for $400.00. Adcox replied that he did not have the money but that he was interested in having the defendant find out more about it. The defendant then told him he could get an ounce of "crystal" for $50.00. Adcox gave him $25.00 toward the purchase price and they agreed to meet later that night. By then Casey had returned to the car, and he and Adcox left.

Around 9:00 that night they met at "King of Pizza." The defendant, with three friends, approached Casey's car, and the defendant handed Adcox another baggy. They discussed the price, with Adcox finally giving the defendant $10.00, making the total price $35.00. Subsequent analysis revealed that the substance contained in this baggy was not a controlled substance.

On 14 February Casey called the defendant about buying another gram of MDA. Casey and Adcox met the defendant at about 4:00 p.m. in the A & P parking lot; and as they drove around town together, the defendant gave Casey another baggy containing MDA. Adcox paid the defendant $45.00 for the gram. Adcox also told him that the crystal purchased on the 8th had been no good, that he had gotten mad and thrown it away. The defendant told him how to test the substance he was buying. They discussed the ounce of MDA again and talked about drug business in general. The defendant then agreed to take them to Joel Patterson's house to purchase some "T"; but Casey testified that as they drove up, "Mr. Board saw some cars he knew that was (sic) parked there and said he did not want to go in because he knew whose cars they were and that most of the guys were hoods." They left and carried the defendant home.

On cross-examination, Casey testified that he had known the defendant and his family most of his life. They attended

the same church, and he participated with the defendant in "outside activities like softball and things like that." Prior to January 1975, he had been in the defendant's home either to play basketball or to go to the flower shop which Mrs. Board ran at the house. After meeting Mr. Lee, he would go to the defendant's home once a week or once every two weeks.

Casey became coach of the basketball team at about the same time he began working for the S.B.I. After a game, he would talk to the defendant about the defendant getting drugs for him. Casey testified:

> "I was the coach and he was a player. After a game I just asked him if he knew where any were at or if he could find some. He told me at the time he did not know where he could find any. He told me he couldn't find any but he'd keep hunting. * * * I called his home and talked to him on the telephone about trying to get it. * * *
>
> I asked his mother and father to allow him to be in a Scout Explorer Troop. That I would like to have him in that troop and they encouraged it and said yes they'd like to have him in the troop. * * * In February of 1975. There was an explorer post. I talked to this young man about being in the post. I even gave him an application blank for it. He was never in the post. He never did return the application to me and never said nothing about it after talking to me."

Prior to talking with Mr. Lee, he had never asked the defendant to join the Explorers, although he had been active in the organization for over four years.

Casey represented to the defendant that he had been involved in drugs while in the Air Force stationed in Mississippi and that he needed some drugs. He smoked marijuana with the defendant and other "young boys" who were there "to act like [he was] with the crowd." Casey testified that it was only when he told the defendant that he had a friend in Charlotte, "Big Jim," who wanted some drugs, and that Jim was coming to town on Friday, 7 February, that the defendant said he would try and find Casey some drugs.

On Friday, when they met in the parking lot, Agent Adcox played the part of Jim. When Casey introduced Jim to the defendant, he told him "it would be better not to rip Jim off."

Casey was paid by the S.B.I. for his expenses. At the time he was doing this undercover investigation "he answered to Mr. Lee of the S.B.I.," and he was paid specifically for his work involving the defendant.

On cross-examination, Adcox testified that he understood the defendant to believe that the initial purchases were for Casey's and Adcox's personal use—that it was not until the defendant met Adcox that he learned that the purchases were for resale.

The defendant offered evidence tending to show that while he supplied Adcox with the two bags of MDA, he did so only to satisfy his friend Casey, who had been persistent in wanting him to find some drugs. When Casey asked him if he could get some drugs, the defendant initially refused because he did not know where they could be purchased. Because of his friendship and respect for his coach and friend, though, when Casey said he "needed" some drugs and "had to have" some drugs for his friend Jim, the defendant asked several of his fellow students where he could find some drugs.

At the time he first purchased the MDA he did not even know what it was. While he admitted to boasting to Jim about his expertise and knowledge of drugs, he contended he had never used any drugs other than marijuana and the only "sales" he had ever made were when he would buy marijuana and friends would pay him for part of it. His talk was to impress "Big Jim" who he thought was a big time dealer.

The defendant and both his parents testified to the persistence of Casey in developing a close relationship with the defendant. Beginning in January, Casey called at least once and sometimes two or three times a day to speak with the defendant. He came to the defendant's house four or five times a week. He often left with the defendant after basketball games. He developed a close relationship with defendant's parents who encouraged the defendant to be friends with Casey.

After the defendant had made the two purchases for Casey, he refused to supply Adcox with any more drugs. He felt that if they wanted the drugs he would introduce them to the people who sold the drugs but that he should not have to make their purchases for them. He tried to avoid Casey. He refused to see Casey when he came over and would not return his calls. Defendant's parents noticed the change in attitude. They became

insistent with the defendant that he maintain his friendship with Casey. They demanded that he return Casey's calls and continue to see Casey. They encouraged him to join the Explorer Scouts with Casey. It was only after it was apparent the defendant would not make additional drug purchases that Casey stopped calling and coming by the defendant's home.

Casey smoked marijuana with several of the players at one of the basketball games. Yancy Doby testified that Casey had "offered" him some drugs and had tried to get him to purchase drugs for him, even to the point of coming by his house with Adcox and a black male and trying to get him to go with them, but that Doby had refused.

The defendant was convicted on all four charges. From judgment entered on one charge that the defendant be imprisoned for four weekends in the county jail and on the other three charges suspending a sentence of six years, fining the defendant, and placing him on probation for five years, the defendant appealed.

*Attorney General Edmisten by Associate Attorney T. Lawrence Pollard for the State.*

*Davis, Ford and Weinhold by Robert M. Davis for defendant appellant.*

HEDRICK, Judge.

[1] Defendant assigns as error the denial of his motions for judgment as of nonsuit. Citing *State v. Stanley,* 288 N.C. 19, 215 S.E. 2d 589 (1975), and numerous other cases, defendant contends the evidence discloses as a matter of law that he was "entrapped" by law enforcement officers into committing the criminal offenses which he did not otherwise contemplate doing. We do not agree.

In *State v. Stanley, supra* at 32, Justice Branch wrote the following:

> "The rule governing the application of the defense of entrapment as a matter of law is clearly and concisely stated by the New Hampshire Supreme Court in *State v. Campbell,* [110 N.H. 238, 265 A. 2d 11]. We quote from that case:
>
> Ordinarily, if the evidence presents an issue of entrapment it is a question of fact for the jury to determine. The

court can find entrapment as a matter of law only where the undisputed testimony and required inferences compel a finding that the defendant was lured by the officers into an action he was not predisposed to take." (Citations omitted.)

While the State's evidence, particularly that elicited from Casey on cross-examination, raises an inference that Casey used his position as basketball coach, confidant, and friend of the defendant to induce the defendant to commit offenses which he did not otherwise contemplate committing, the evidence likewise raises an inference that the agents of the SBI and Casey merely afforded the defendant the opportunity to commit offenses which he was predisposed to commit and which actually originated in the defendant's mind. These conflicting inferences of fact must be resolved by the jury under proper instructions. Upon this record we cannot say the "undisputed testimony and required inferences compel a finding that the defendant was lured by the officers into an action he was not predisposed to take."

[2]   This brings us to the defendant's contention that the court erred in its instructions to the jury. Defendant excepted to the following instructions.

> "I instruct you that a person such as Ernie Casey who honestly and in good faith carried out the instructions of a police officer and who acts for the exclusive purpose of assisting in law enforcement does not violate the law."

At trial, defendant's entire defense was that he was entrapped into the commission of the offenses charged. Whether the defendant was entrapped necessarily depended upon the conduct of the witness Casey and his association with the defendant. The defendant's evidence with respect to Casey's conduct and his relation with the defendant was in conflict with that of the State. Thus, the credibility of the testimony of Casey was critical to the defendant's defense. In the challenged instruction, the judge clearly expressed an opinion on the credibility of the witness Casey. It was for the jury to say whether he "honestly and in good faith" carried out the instructions of an agent of the SBI. It must be remembered that Casey was a bank employee who wanted a career in law enforcement, and he was acting as an undercover agent only at the time of his involvement with the defendant. We think the challenged in-

struction was prejudicial to the defendant and entitles him to a new trial.

We need not discuss defendant's additional assignments of error since they are not likely to occur at a new trial.

New trial.

Judges MORRIS and ARNOLD concur.