STATE OF NORTH CAROLINA v. JAMES BUDDY WALKER

No. 45

(Filed 29 August 1978)

1. **Criminal Law § 7— elements of entrapment**

    The defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers or their agents to induce a defendant to commit a crime, (2) the criminal design originated in the minds of government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities.

2. **Criminal Law § 7.1— entrapment—insufficient evidence to require instruction**

    In a prosecution for possession of heroin with intent to sell and sale of heroin in 1976, the trial court properly refused to charge the jury on the

State v. Walker

defense of entrapment where the following evidence relevant to entrapment was presented: (1) defendant, while on work release during a prison term on an unrelated drug charge, met with the N.C. Attorney General to discuss supplying information on area drug traffic, and the Attorney General agreed to inform the parole board if information supplied by defendant proved useful; (2) defendant then gave information to the Attorney General which did prove useful; (3) while still in prison, defendant met with an SBI agent, who told him about two heroin sales defendant had made to an undercover agent in 1975 and, according to defendant's testimony, informed him of the undercover agent's name; (4) defendant left the latter meeting with the understanding that charges concerning the 1975 sales would be dropped if he would associate and deal with people in the drug trade and continue to supply information; (5) when the undercover agent came to defendant's house in 1976, defendant recognized him as such and got drugs for the agent because he was under the impression that he was supposed to do so in order to get the 1975 drug charges dropped; (6) defendant admitted that, on the basis of his meetings with the Attorney General and the SBI agent, he did not feel that he had a license to go out and sell heroin; (7) the Attorney General testified that he did not authorize defendant to work as an undercover agent; (8) defendant testified that he had not dealt in drugs after his release from prison, other than the sales to the undercover agent, and that when a person once had been in the drug business there was no problem getting information; (9) and defendant neither contacted nor supplied information to any law enforcement official from the time of his meeting with the SBI agent until his sale of heroin to the undercover agent some five months after his release from prison.

    Justice EXUM dissenting.

ON indictments proper in form, defendant was charged with and convicted of two counts each of felonious possession of heroin with intent to sell and felonious sale of heroin. The Court of Appeals, 34 N.C. App. 501, 238 S.E. 2d 322 (1977), (*Parker, J.,* concurred in by *Morris* and *Clark, JJ.,* reported under Rule 30(e) ), found no error in defendant's trial before *Bailey, J.,* 6 November 1976 Session, WAKE Superior Court. We allowed discretionary review 24 January 1978.

The State's evidence tended to show the following facts:

On 26 August 1976, James W. Lewis, an undercover drug agent for the State Bureau of Investigation, went to defendant's residence in Raleigh to find out if defendant was selling drugs and while there purchased two packages of heroin from him for $25.00 each. At the time of this transaction, defendant told Lewis that "the dope won't that good" and stated that if Lewis would return the next day, he would give him an extra package free. Lewis returned to defendant's home on 14 September 1976, at which time defendant sold him two more twenty-five-dollar packages of heroin and gave him a third package free, saying it

was the one he had promised Lewis earlier. The sales on these two dates are the subjects of the indictments on which the instant convictions are based. Agent Lewis had made two previous heroin buys from defendant in early 1975, including one in April of that year, when he first became acquainted with defendant.

Defendant's evidence tended to show that:

In 1975, defendant, on charges unrelated to the sales to Agent Lewis, pleaded guilty to selling heroin and was sentenced to two years imprisonment which commenced on 25 April of that year. While on work release during this imprisonment, defendant was employed at a Howard Johnson Restaurant on Glenwood Avenue. On defendant's request, his supervisor at the restaurant, who was a friend of North Carolina Attorney General Rufus Edmisten, arranged a meeting between the Attorney General and defendant in November or December of 1975. At this meeting, the Attorney General agreed that if defendant provided information on area drug traffic he would inform the parole board that defendant had been helpful. Defendant then gave information to the Attorney General which did prove useful. At a later date, defendant met with SBI Agent Joseph Freeman, who informed him of the two heroin sales defendant had made to Agent Lewis earlier in the year. Defendant testified that he left this meeting with an understanding that if he would associate and deal with people in the drug trade and continue to supply information, charges concerning the two 1975 sales would be dropped. Defendant subsequently was released from prison on 30 March 1976. Defendant further testified that he procured and sold the heroin to Agent Lewis in August and September of 1976 because he had been told by Agent Freeman that Lewis was an SBI Agent and it was his understanding that this was what he was supposed to do in order to erase the two 1975 charges.

On rebuttal, SBI Agent Freeman testified that he made no promises to defendant during their 1975 meeting, nor did he tell defendant who had made the undercover drug purchases from him in early 1975. In addition, two of defendant's neighbors testified that during the spring and summer of 1976, they observed defendant frequently hiding and retrieving small packages outside his home and that people often left defendant's house in a drugged or intoxicated condition.

Additional facts relevant to the decision are set out in the opinion.

State v. Walker

*Joseph Reichbind for defendant appellant.*

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General John R. B. Matthis and Assistant Attorney General Alan S. Hirsch for the State.*

COPELAND, Justice.

The sole assignment of error brought forward by defendant on this appeal challenges the refusal of the trial court to charge the jury on the defense of entrapment. We have determined that this assignment is without merit; therefore, decision of the Court of Appeals must be affirmed.

It appears that the first reported consideration of the question of entrapment is found in *Genesis* 3:13 in which the Creator rejected the plea of Eve, offered in defense of having eaten of the tree of knowledge, that, "The serpent beguiled me, and I did eat."

[1] This Court has earlier held that, "Whether the defendant was entitled to have the defense of entrapment submitted to the jury is to be determined by the evidence. Before a Trial Court can submit such a defense to the jury there must be some credible evidence tending to support the defendant's contention that he was a victim of entrapment, as that term is known to the law." *State v. Burnette*, 242 N.C. 164, 173, 87 S.E. 2d 191, 197 (1955). The defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers or their agents to induce a defendant to commit a crime, (2) when the criminal design originated in the minds of the government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities. *Sherman v. United States*, 356 U.S. 369, 2 L.Ed. 2d 848, 78 S.Ct. 819 (1958); *State v. Stanley*, 288 N.C. 19, 215 S.E. 2d 589 (1975); *State v. Burnette, supra.* In the absence of evidence tending to show *both* inducement by government agents *and* that the intention to commit the crime originated not in the mind of the defendant, but with the law enforcement officers, the question of entrapment has not been sufficiently raised to permit its submission to the jury. *State v. Fletcher*, 279 N.C. 85, 181 S.E. 2d 405 (1971); *State v. Coleman*, 270 N.C. 357, 154 S.E. 2d 485 (1967); *State v. Burnette, supra.*

[2] The evidence in the instant case relevant to the entrapment issue is as follows: (1) defendant, while on work release from

prison during a term imposed on an unrelated drug charge, met with Attorney General Rufus L. Edmisten to discuss supplying information on area drug traffic; (2) the Attorney General agreed to inform the parole board of defendant's help if the information supplied by defendant proved useful; (3) while still in prison, defendant met with SBI Agent Freeman, who told him about the two heroin sales defendant had made to an undercover agent in early 1975 and, according to defendant's testimony, informed him that the undercover agent who had purchased the drugs was James Lewis; (4) defendant left this latter meeting with an understanding in his own mind that he was to associate and deal with people in the drug trade and provide more information; (5) when Agent Lewis came to defendant's house in August of 1976, defendant recognized him as an undercover agent and got drugs for Lewis because he was under the impression that he was supposed to do so in order to get the 1975 drug charges dropped; (6) defendant admitted on cross-examination that he did not feel that, on the basis of his meetings with the Attorney General and Agent Freeman, he had a license to go out and sell heroin; (7) the Attorney General, testifying as a witness for defendant, indicated that at no point did he authorize defendant to work as an undercover agent; (8) on further cross-examination, defendant stated that, although he had sold drugs prior to his 1975 convictions, he had not dealt in drugs after his release from prison in March of 1976, other than the sales to Agent Lewis, and that when a person once had been in the drug business, there was no problem getting information.

Defendant's position here is that he understood from his discussions with the Attorney General and SBI Agent Freeman that he was to remain in contact with people in the drug trade and supply information on drug traffic to state law enforcement officials in order to have the 1975 heroin charges dropped. From this defendant asserts that a jury could conclude that when Agent Lewis came to his home and asked defendant to get some heroin for him, defendant, having recognized Lewis as an undercover agent, felt that he was acting in accord with some sort of perceived agreement with the Attorney General and Agent Freeman in procuring the heroin and selling it to Lewis and, consequently, that defendant was entrapped into committing the crimes charged in the indictments here. Nowhere in defendant's account of these two meetings, however, is there any indication that either of the officials with whom defendant spoke suggested

that he sell heroin in the course of his continued association with drug figures. Indeed, as noted above, defendant conceded that he did not feel that he had a license to sell heroin. Defendant further stated that once a person had been in the drug business, there was no difficulty in getting information on the trade. In addition, defendant's testimony discloses that he neither contacted nor supplied information to any law enforcement official from the time of his November 1975 meeting with Agent Freeman until the day in August of 1976, some five months after defendant's release from prison, when Agent Lewis appeared at defendant's residence in his undercover capacity seeking to purchase drugs.

It is our conclusion that this evidence is simply insufficient to permit a jury to reasonably infer that any undue persuasion, trickery or fraud was practiced by government agents upon defendant to induce him to carry out the alleged heroin sales in question. The discussions related by defendant concerned only the supplying of information on activities within the drug trade and not active participation by defendant therein. Defendant does not contend that it was necessary for him to involve himself in drug sales in order to obtain knowledge to be transmitted to the authorities. He clearly conceded that information was available to him merely by virtue of his past involvement in the drug business; yet, other than one unsuccessful attempt, defendant failed to seek to communicate with any official so as to supply that which he asserts was the *quid pro quo* of his alleged agreement with the State.

Activity on the part of law enforcement agents which brings about the commission of a criminal act by a defendant *as a result of the persuasion* of the agents constitutes entrapment under our law. *State v. Stanley, supra.* Defendant's own evidence here, however, indicates that the earlier persuasion exercised by the State was directed explicitly to a quest for information and that the actions of Agent Lewis on the dates of the purchases were merely in the nature of providing an opportunity for criminal conduct and not excessive inducement. Merely affording opportunities or facilities for the commission of a crime, however, does not amount to entrapment. *Sorrells v. United States*, 287 U.S. 435, 77 L.Ed. 413, 53 S.Ct. 210 (1932). We therefore hold that the trial court did not err in refusing to submit an instruction on entrapment to the jury and defendant's assignment of error to the contrary is overruled.

For the reasons stated, the decision of the Court of Appeals finding no error in defendant's trial and conviction is

Affirmed.

Justice EXUM dissenting.

I vote for a new trial for failure of the trial court to submit the defense of entrapment to the jury. The legal definition of entrapment is correctly stated in the majority opinion. Defendant's evidence makes out a classic entrapment defense under this definition. It shows, or provides bases for reasonable inferences, that the crimes charged were induced by the actions of law enforcement officials, that the 1976 sales to James Lewis, an undercover agent with the State Bureau of Investigation (SBI), originated with agents of the state and not the defendant, and that these sales were a product of overtures by Lewis and other officials to defendant rather than defendant's criminal inclinations.

The evidence is undisputed that defendant sold heroin to Lewis while Lewis was an undercover agent for the SBI in March and April, 1975. Defendant had also made other sales in 1975 to which he pleaded guilty and for which he was sentenced to two years imprisonment. Immediately prior to the inception of his prison term he made the sales to Lewis. He was not indicted for these 1975 sales to Lewis until February, 1976. He was arrested therefor in February or March, 1976, and immediately acquired counsel to represent him. While defendant was required to post a $10,000 appearance bond on the charges being tried here, he was released on his own recognizance on the charges arising out of the 1975 sales to Lewis. These charges were pending when defendant dealt with Lewis in August and September, 1976. So far as the record reveals they had not been disposed of at the time of defendant's trial on the instant charges in November, 1976.

Defendant testified that he understood these indictments for the 1975 sales to Lewis would be dropped if he continued to cooperate with the SBI in its undercover drug operations. The attorney representing him on these charges, Mr. Douglas DeBank, corroborated his testimony. Mr. DeBank testified that the Attorney General agreed to recommend to the Wake County District Attorney that these charges be dropped in return for defendant's help. Defendant said he became aware in November,

1975, that the state knew of these 1975 sales to Lewis. He testified:

> "I met with Mr. Freeman [Special Agent and Assistant Supervisor with the SBI] in the last of November. Well, he made me aware of the two sales and asked me did I remember a Mr. James W. Lewis at the time. Mr. Lewis is that gentleman there. He did not tell me what I was going to be charged with those two sales. I was under the impression that if I continued giving them information that the two charges were supposed to be dropped.
>
> COURT: Did he say that?
>
> A. Yes, sir. He said that he would see what he could do about it."

Defendant further testified that when Lewis approached him on 17 August 1976 he told Lewis that he had nothing to sell. Lewis then asked, "[W]ould I get something for him and I told him yes I would. I had the impression that that was what I was suppose [sic] to do. When he requested me to get drugs for him I knew that he was an SBI agent. I got it for him because I was under the impression that that was what I was suppose [sic] to do."

Defendant readily admitted selling heroin to Lewis on 26 August 1976 and 14 September 1976. His entire defense rested on entrapment. He testified that on 14 September 1976 he was in the presence of a drug dealer when Lewis came to make the purchase. He said, "Lewis gave me the money, I gave it to the guy and I gave him the drugs. Lewis gave me the money, I gave it to the dealer and the dealer gave me the drugs and I handed it to him. I felt I was suppose [sic] to help him. The dealer who was at my house on September 14th was 'Shaky'. I don't know his last name." Defendant further said, "But I felt like you were trying to make a bust, but I had no idea that he would bust me with it."

Defendant's testimony itself tends to show he was induced to make the 1976 sales to Lewis by agents of the state and that the sales were the product of the creative activity of these agents rather than defendant. Lewis, according to defendant, did more than merely give defendant an opportunity to commit a crime. His words and actions together with defendant's earlier conversations with other officials made defendant believe he had to comply with Lewis' request as a part of his earlier agreement to cooperate with the authorities.

The majority, however, concludes that the contacts made with defendant by the authorities furnished no reasonable basis for defendant's belief that he was expected by them to sell heroin to Lewis in August and September, 1976. I strongly disagree with this assessment of the evidence relating to these contacts. The Attorney General testified that in November or December, 1975, he talked personally with defendant. While making it clear that he made no promises to defendant, the Attorney General did say he agreed to accept information from defendant. He said further, "Mr. Walker gave us certain knowledge, certain information. The information did prove helpful. . . . Q. Did you anticipate further information from Mr. Walker? A. I am sure that I was hoping there would be."

Freeman testified for the state in rebuttal. He admitted talking with defendant while defendant was in prison in November or December, 1975. He said he requested defendant to cooperate with the SBI in its undercover drug operations and to help it in gathering information. Freeman also admitted that he told defendant "that our agent had purchased heroin from him and that he would be indicted for that." Freeman denied mentioning Lewis' name to defendant and said, "I did not know if [defendant] ever knew who James Lewis was."

It is true that no one, including defendant, testified that any person in an official capacity told defendant expressly that he was to sell drugs to Lewis or to anyone else. Defendant conceded that he had no license to sell heroin generally and that he had avoided doing so since being released from prison. He was, however, supposed to "cooperate" with the state and to assist it in gathering information about illicit drug traffic. Moreover, and most importantly, he says he knew in August and September, 1976, that Lewis was an SBI undercover agent, having been advised of Lewis' identity by Freeman in November, 1975. Whether Freeman in 1975 expressly advised defendant of Lewis' identity, it seems reasonable to assume that defendant knew Lewis' identity at least as early as February or March, 1976, when he was indicted, arrested and acquired counsel in connection with the 1975 sales to Lewis.

These arrangements for defendant's cooperation together with his knowledge of Lewis' identity form a reasonable, if not a compelling, basis for defendant's belief that he was supposed to comply with Lewis' request to acquire and deliver heroin to Lewis. "Cooperation" can take many forms. Defendant's realiza-

tion that he had no license to sell heroin generally does not detract from his stated belief that he was supposed to cooperate with Lewis whom he knew to be an undercover agent. If defendant, experienced in illicit drug traffic, knew in August and September, 1976, that Lewis was an undercover SBI agent, it is inconceivable that he would have dealt with him other than under the belief that he was expected to do so by the authorities.

The question, in essence, is not what the Attorney General, Freeman, and Lewis subjectively intended defendant to do or not to do. The question is what their words and actions might have reasonably led him to believe he was supposed to do. Whether defendant in fact knew Lewis' identity, whether he sold to Lewis believing this was what the authorities intended him to do, and the reasonableness of defendant's belief under the circumstances, are crucial factual questions which the jury under proper instructions, and not this Court, should resolve.