HOOPER JOHNSON v. J. D. ORRELL.

(Filed 30 November, 1949.)

**1. Principal and Agent § 2—**

The relationship of principal and agent must be created by mutual agreement and cannot be created by one party *in invitum*.

**2. Brokers § 3—**

Where the owner of land has neither listed his property with a broker nor in any way engaged him to sell the property, no presumption of agency arises from the mere fact that the broker has contacted the owner with a prospective purchaser and that a sale has been consummated.

**3. Same—**

Where a broker declares upon a written contract for the recovery of commissions, his rights must stand or fall upon the contract and he may not establish the relationship of principal and agent through the negotiations of the parties culminating in the sale of the property.

**4. Brokers § 10: Alteration of Instruments § 1—**

Where a broker, after the execution of the contract for the sale of property, inserts in the vendor's copy a provision for the payment of commissions, the vendor is not bound by the alteration unless he ratifies it, which involves both knowledge of the alteration and intent to ratify, and the mere fact that the contract as altered was left in the possession of the vendor does not put him on constructive notice of the alteration and is insufficient to establish ratification.

DEFENDANT's appeal from *Hamilton, Special Judge,* April 1949 Term, NEW HANOVER Superior Court.

The plaintiff operated a real estate agency in the City of Wilmington, buying and selling real estate for others as agent, and charging and receiving a commission on property sold for others "while acting as their agent."

He brings this action to recover $750 which he claims as the balance of $1,250 due him on a written contract for the sale of defendant's land to a "client" under the following circumstances:

The client named by the plaintiff was R. L. Brinson. The subject property, located on the west bank of the Cape Fear River opposite the City, was an extensive area, occupied by a warehouse, with a wharf for loading and unloading craft on the river. Mr. Brinson was engaged in the sale of oil, and transportation of oil between Wilmington and High Point, and interested in the location of a convenient site for the repair and storage of Diesel engines. Mr. Brinson contacted the plaintiff some weeks before and the latter, at his instance, searched the vicinity for a suitable site, and found none which would be satisfactory to Brinson except the location owned by Orrell, which seemed to be in an inactive state, although still in use by Orrell. He showed the property to Brinson, who, having examined it and finding it extensive enough for the purpose, said he would take it.

*"I obtained a contract with Mr. Brinson to buy this property from Mr. Orrell;* took Mr. Brinson over and he looked at the land, said he would take it; came back to Mr. Orrell's office, and I told him we wished to

enter into this contract. He said he had no stenographer, and I used his typewriter and made two copies and gave them to Mr. Brinson and Mr. Orrell to sign. On the copy for Mr. Orrell and on the copy I held I wrote the amount of commission. That did not appear on the purchaser's copy."

"I took Mr. Orrell's copy to the machine and inserted the regular rate of commission in there."

Brinson paid $500 on the purchase price as testified by plaintiff, giving him the means with which to pay it to Orrell. Mr. Brinson said that if he was no longer needed he would be on his way, and left for the car with his copy.

"On that contract that is Mr. Brinson's signature, and that is my original signature, both are original signatures. That is the original contract retained by me. I gave Mr. Orrell an exact copy of the contract; made two copies of the original and gave Mr. Orrell one and Mr. Brinson one." Some question arising as to the time it would take to complete the transaction, Mr. Brinson paid the further sum of $1,500 on the contract, $1,000 of which he says he gave to Orrell and $500 of which he put in escrow until the transaction was completed. Ultimately Brinson paid $12,500. On cross-examination plaintiff stated, "Mr. Brinson did not pay the money at his first contract with Mr. Orrell, I had the money. I received $1,500 later to extend the contract; he said he would have to have $1,000 to extend it; the other $500 was held in escrow until consummation of the sale. I think I mailed it to him after a telephone conversation. Mr. Bellamy gave Mr. Orrell the balance of the purchase price, including two of my checks, that could not be prevented . . . the purchase price was paid and included one or two of my checks." . . . Witness did not remember whether he delivered or mailed the $1,000 to Mr. Orrell, didn't know if Mr. Bellamy gave Mr. Orrell two of his checks at the conclusion of the sale, he must have given them to Mr. Bellamy; did not give them to Mr. Orrell.

Various witnesses who were introduced, who professed to be acquainted with the customs observed in the sale of real estate through the offices of realtors, testified that the customary fee for selling property within the City of Wilmington was five per cent, and that for selling it outside Wilmington was 10 per cent, and that the property was outside the City limits.

This testimony was objected to by the defendant on the ground that he had sued on a specific written contract, stating the amount of commissions, and the objection was overruled. It was admitted that the subject property had not been listed with the plaintiff or any other real estate agency.

J. D. Orrell testified that when he was contacted by Mr. Johnson over the phone and asked if he wanted to sell his property on the west bank of the Cape Fear River, he told him he didn't know whether he wanted to sell and didn't know whether Johnson had enough money to buy. Johnson said he had a client who had money and asked defendant what he would take for it, and was told he would take $12,000 net. Later he had to go to his warehouse to get some machinery and found Johnson and his client Brinson there and they asked him about the lines and distances in feet. Johnson said they would be in defendant's office in a few minutes to discuss this. Defendant stated he had not been in his office more than five minutes before they came and Brinson asked him about the length and width of the property. He showed Brinson the deed to the property and he said it was sufficient.

Brinson then paid him on the trade five $100 bills and they went into negotiations about the time it would take to complete the contract and about the fact that Orrell had some equipment in the building. Defendant had in mind to see an attorney and have the contract drawn, but Mr. Johnson said he had a regular real estate form of contract, giving to witness one in blank. Both read it and witness said he saw nothing wrong with it; they were just two pieces of paper. Johnson said he could draw it up as good as an attorney, stepped to the typewriter and knocked it right off; gave him one copy and Mr. Brinson one copy to sign. Witness signed one copy and Brinson another, and swapped. When Mr. Brinson said he had to be going he walked out of the office and Mr. Johnson said, "let me see that contract," and he gave it back to him, and that is the last time he had seen the paper. Witness identified copy of paper which was given to Brinson by Johnson, stating that he had come in possession of it by calling Mr. Brinson on the telephone, telling him what had happened. Johnson had brought this suit. Brinson mailed him the copy in a registered letter. Witness testified that this was the only copy of the agreement between himself and Mr. Brinson, and Mr. Johnson that he ever saw except the copy Johnson sent him later at his request. Then he discovered what had been written into the contract.

The defendant stated that he first received $500 of money, then Mr. Johnson's check for $850, the check from the purchaser for $10,500 on the same day, when the purchase was closed. These checks were exhibited. Witness stated he never received $1,000 for the extension of the contract; never received 15 per cent. He stated that when Mr. Johnson got these first two checks deposited there was no mention of commission being taken out in the transaction; said the property was sold on a flat basis. The difference in the stamps on the deed would make the payment accepted by defendant as $12,000 even money. The witness stated that Mr. Bellamy was not his attorney.

Witness stated that after the agreement on the contract was signed Mr. Johnson was writing something and carried it off with him.   He didn't know what he was writing on or whether he was writing on the contract, and that he did not investigate it but heard him writing.   He was talking to Mr. Brinson and since Mr. Johnson wrote on it he hadn't seen the contract; that in fact witness went to the car with Mr. Brinson and talked with him about the oil and the trucks.   Johnson had already handed witness a copy of the agreement but witness had handed it back to him.

The copy of the contract witness got from Mr. Brinson did not have the 10 per cent commission in it.   If it had been, he would not have signed it.

The reason he called Mr. Johnson for a copy of the contract was because the time was about to elapse.   There was a dispute between them about whether Johnson had given the contract to witness; but the copy mailed to him had a 10 per cent commission written in it and witness immediately told him it was a bogus contract.   He never made any demand on him for the $750 until he instituted the suit.

Witness stated that he had never received a penny after the $500 was paid until the transaction was closed up and in that he received the balance of the money from Mr. Bellamy who was not his attorney.   That is to say the checks of Johnson and $10,500 direct from Brinson.

At the conclusion of the plaintiff's evidence the defendant demurred thereto and asked for judgment of nonsuit, which was overruled.   And again at the conclusion of all the evidence the defendant renewed his demurrer and motion for nonsuit, which was declined, and defendant excepted.   The evidence went to the jury and the issues were answered against the defendant.          °

The defendant moved to set aside the verdict for errors of law, which motion was also overruled, and defendant excepted.   To the ensuing judgment defendant excepted, appealed, assigning as errors the admission of the evidence of the customs of realtors as above stated, and the overruling of his motions for judgment as of nonsuit.

*Rodgers & Rodgers for defendant, appellant.*
*W. K. Rhodes, Jr., for plaintiff, appellee.*

SEAWELL, J.   The plaintiff is relying on a specific written contract between himself and the defendant on which to recover from the latter the commission he claims.   The evidence, *dehors* the document, would hardly establish the relation of agency between the plaintiff and the defendant at all.   Agency is the product of a mutual agreement.   It is a situation which cannot be forced on a person *in invitum,* and no presump-

tion or inference of agency arises from the fact that a realtor, with a buying client, has contacted a person willing to sell, and has consummated the sale. The defendant had not listed his property with plaintiff or initiated any relation of that sort. Whether, in the course of the negotiations the plaintiff had succeeded in, so to speak, backing himself into that position, might have been a question for the jury except for the fact that the plaintiff, as stated, sued on an alleged written contract, and his rights must spring out of that writing, or fall with it.

The circumstances surrounding the alteration in the contract of sale between Brinson and Orrell are markedly unusual. After the contract between these two had been read, approved and signed in duplicate, and Brinson, considering the business finished, took his copy and retired, plaintiff took the copy and without calling the attention of Orrell to what he was doing, typed into the body of it an alteration to the effect that the sale was subject to a commission of 10 per cent in favor of himself. This, he says, he gave to Orrell. Orrell says he did not. The dispute over this detail is not conclusive. Since the plaintiff admits that the matter constituting the alteration was made after both Brinson's and Orrell's signatures had been placed on the document (which had been made in duplicate) it could only become effectual by way of ratification and this must be both with the knowledge of the party to be charged as well as with the intent to ratify.

> "In order that any acts of the party may be constituted as ratification of an alteration, the particular act must be done with the full knowledge of the alteration."
>
> "The party must have knowledge in fact, and it is not sufficient that he had means of knowledge." 3 C.J.S., Alteration of Instruments, sec. 78.

This is certainly true unless the circumstances are such as to put the duty on the party charged to further examine the instrument, or such as to put him on constructive notice, neither of which appears here. Johnson assumes that Orrell read it because he gave it to him—passes from that assumption to the statement, "I know he read it," which must be considered in connection with the only indication of knowledge as to which he testified, that Orrell had the paper.

The evidence discloses that there had been serious controversy between the plaintiff and the defendant about the matter of commissions—the defendant declaring that plaintiff was Brinson's agent and that he had offered him a flat price, plaintiff contending that he owed him commissions at 10 per cent. This emphasizes the duty of plaintiff under the circumstances to have brought to the attention of defendant the alteration

he admits having made over defendant's name without first getting his consent.

Looking at the evidence as a whole we do not deem it sufficient to go to the jury as bringing to the knowledge of the defendant the alterations made in the Orrell-Brinson contract in favor of himself, over the signature of the parties, a thing necessary to its validity.

The plaintiff took the very unusual method of inserting a clause for his benefit under a misleading heading on a contract made *inter alios* and we cannot see that there is any presumption that the possession of the paper by the party charged, even if it had been admitted, was sufficient in law or in fact to put him on constructive notice of the alteration.

Ratification is as effectual in law as original execution. But it is not sufficiently evidenced in this case to make it a jury question.

The motion for judgment of nonsuit should have been allowed. The judgment to the contrary is

Reversed.