STATE OF NORTH CAROLINA v. SHERWIN RENE LUSTER

No. 23A82

(Filed 5 October 1982)

**1. Criminal Law § 7— entrapment—officer or agent of government**

Entrapment is a defense only when the entrapper is an officer or agent of the government.

**2. Criminal Law §§ 7.1, 121— entrapment by agent of police—instruction not required**

In a prosecution for felonious possession of a stolen automobile which was sold by defendant to a police-organized sting or undercover fencing operation, defendant was not entitled to an instruction on the defense of entrapment by an agent of the police where an unwitting third party, presented with an opportunity to commit the offense by an undercover police officer, induced defendant's participation in the offense without specific direction of the officer, since the third party was not an agent of the police. Nor was defendant entitled to the general entrapment instruction for the reason that the evidence established that he was not an innocent victim without predisposition to commit the crime where it disclosed that defendant accepted from the undercover officers a few hundred dollars for a relatively new automobile and then accepted from the third party only a percentage commission of that amount, and that defendant bragged to the undercover officers that he dealt in stolen cars, that he had inside contacts at a car dealership, and that he could get better and more expensive cars and other goods.

**3. Criminal Law § 121— evidence did not require entrapment instruction**

In a prosecution for larceny of an automobile which was sold by defendant to a police-organized sting or undercover fencing operation, testimony by defendant that, when he earlier sold a car to the undercover officers, an officer handed him money and asked him if he could bring some more cars did not require the trial court to instruct on the defense of entrapment where defendant's testimony was overwhelmingly refuted by the testimony of other witnesses present during the prior sale and by a videotape of that transaction.

Justice MARTIN took no part in the consideration or decision of this case.

Justice EXUM dissenting.

Justice CARLTON joins in this dissent.

ON appeal from an unpublished decision of a divided panel of the Court of Appeals.[1] This appeal involves two separate trials. In Case No. 79CRS22551 before *Clark, J.* at the 16 December 1979 Session of Superior Court, DURHAM County, defendant was found

1. 55 N.C. App. 482, 288 S.E. 2d 388 (1982).

guilty of felonious larceny of a 1979 Pontiac automobile and was sentenced to a term of imprisonment of six to ten years. Defendant gave notice of appeal and time for filing the record on appeal was extended from time to time but the appeal was never perfected. In Case No. 79CRS28603 before *Godwin, J.* at the 8 January 1980 Session of Superior Court, DURHAM County, defendant was found guilty of felonious possession of a 1978 Dodge automobile and was sentenced to six to ten years to commence at the expiration of the sentence imposed in Case No. 79CRS22551. As in the former case, notice of appeal was given and time for filing the record on appeal was extended from time to time but the appeal was never perfected. On the same day judgment was entered, a motion for appropriate relief was filed by defendant's trial counsel but was never heard or disposed of. Subsequently, on motion of defendant, his trial counsel was removed and new counsel was appointed. Defendant's new counsel filed motions to extend time for filing records on appeal, which the Court of Appeals treated as petitions for writs of certiorari and ordered that they be allowed. The cases were consolidated for appellate review. The Court of Appeals, with one judge dissenting, found no error.

*Rufus L. Edmisten, Attorney General, by Sarah C. Young, Assistant Attorney General, for the State.*

*Charles H. Hobgood, Attorney for defendant-appellant.*

MEYER, Justice.

Both of the cases before us involve the delivery and sale of the particular stolen automobile to a police-organized "sting" or undercover fencing operation. The issue before this Court in each case concerns the defense of entrapment — in Case No. 79CRS28603, whether the trial judge, though he gave an instruction on entrapment, erred in not instructing on entrapment by an agent, and in Case No. 79CRS22551, whether the trial judge erred in refusing to give an instruction on the general defense of entrapment. We find no error and affirm the decision of the Court of Appeals.

The main question presented by these two appeals is whether entrapment can be effected through an unwitting agent, or otherwise stated, whether the defense of entrapment is

available to a defendant where an unwitting third party, presented with an opportunity to commit the offense by an undercover police officer, then induces defendant's participation in the offense without specific direction of the officer. We hold that under such circumstances the defense of entrapment is not available.

In the interest of clarity we will state the summary of the pertinent facts in each case separately. However, we will not repeat in the second summary those facts not necessary to an understanding of the difference in the issue presented in that case.

## Case No. 79CRS28603

In Case No. 79CRS28603 the State presented evidence that officers of the Durham, North Carolina Public Safety Department, and agents of the State Bureau of Investigation, working under cover, operated a sting operation in a building located at 624 East Geer Street in the city of Durham under the name of Part Time Help Limited. The officers used this part-time employment agency as a front for the purpose of buying stolen property. The operation began in November 1978 and ran through August 1979. Part Time Help Limited was listed in the telephone book and ran one advertisement in the newspaper announcing that they would offer people part-time jobs. Approximately seventy people utilized "the services" of Part Time Help Limited, although not that many were actually arrested. There were some legitimate inquiries for part-time jobs. The obvious purpose of the operation was to combat theft and theft rings and the fencing of stolen goods in and around Durham County. The undercover officers let it be known that they would buy stolen property. As the sale and purchase of the property took place, the transactions between the sellers and the undercover agents were videotaped by a hidden camera. Officer D. L. Raney of the Durham Public Safety Department testified that he was one of the undercover agents involved and that on 22 May 1979 at approximately 3:29 p.m., the defendant Sherwin Rene Luster and another man Ricky Lamont Burnette came into the building. The defendant Luster handed him a set of keys and Officer Raney went outside to look at the car that defendant had brought. As Officer Raney went outside to look over the car, the defendant and Burnette remained inside the

building with an undercover agent of the SBI, Bruce E. Black. Defendant was later charged with the possession of the car, a 1978 Dodge.

When Officer Raney returned to the building, the defendant stated that he could get new Mercedes-Benz and Cadillac automobiles. The defendant agreed to accept $400.00 for the Dodge. Officer Raney laid that amount of money on the counter and the defendant took it. The defendant did not tell the undercover officers specifically how he could get the Mercedes-Benz and Cadillac automobiles but said that he had someone working with him and he could get them.

The defendant did not say how he obtained the 1978 Dodge automobile nor was he asked by the officers.

Officer Raney testified that Burnette had been in quite a few times before and was considered a "regular." Burnette himself had previously brought cars to sell to the undercover officers. Raney testified that as part of the operation the officers encouraged people who came into the store to get other people to bring materials to them. He further testified that when they had recorded a person on tape enough times, they did not exactly discourage him from coming back with the same items, but they did not offer him as much money on succeeding purchases. The officers would continue to suggest to these people that they bring other people around. In effect, the officers told people that they wanted only quality merchandise but could not pay a great deal of money for it. They did not actually say that they would buy "stolen property."

Officer R. D. Simmons of the Durham Police Department was working as the video officer at the time the officers filmed the foregoing transaction with the defendant. In substance his testimony paralleled that of Officer Raney.

After proper testimony concerning the checking and operation of the video camera and the chain of evidence concerning the videotape, it was admitted into evidence and shown to the jury over defendant's objection. Subsequently, defendant made a motion to view the videotape and have a court reporter transcribe the same. Upon proper order a court reporter, who was not present at the trial, viewed the videotape and prepared a transcript of the same which is set out in the record on appeal.

In addition to verifying Officer Raney's testimony, Officer Black testified that the defendant asked if the undercover agents could handle several new cars, indicating that he had access to new Dodges, Cordobas and Challengers, and that he had people working with him on the inside at the Dodge dealership. According to Officer Black, the defendant said that when he got a car, he didn't want to keep it too long and wanted to get it to Part Time as soon as he could.

Officer Black also testified on cross-examination that it was part of his work to get as many people involved in the fencing operation as possible. He told people who brought in property that if they knew others who had any merchandise for sale, to come in and the undercover agents would discuss purchasing the merchandise from them. Officer Black testified that he told this to Ricky Burnette.

Burnette testified that on several occasions he had sold various types of goods including five cars to the undercover agents. All of this had occurred before he met the defendant. He further testified that after a while the undercover officers discouraged him from doing further business and wanted him to bring someone else down with the cars. He made approximately fifteen to eighteen trips over a long period of time and brought five or six different people. Burnette further testified that on 22 May 1979 he went over to the defendant's house and told the defendant that he needed someone to drive a car from Coggin Pontiac, offering to give him a percentage of any money he received for the car. The defendant went to Coggin Pontiac with Burnette, who entered through the fence, got the car and drove it away. The defendant then drove the car to Part Time Help Limited. Burnette told the defendant that the people at Part Time Help Limited would not accept anything from him (Burnette) and asked the defendant to take the keys in and transact the deal for him. He further testified that he told the defendant how to talk to the people to get along with them.

The defendant testified that he had been convicted of misdemeanor breaking and entering when he was sixteen or seventeen but that he had not been in any trouble since then and he was now twenty-three years of age. He testified that he had been out of work some five or six weeks and that Burnette told him that

he was working for Part Time Help Limited when he asked the defendant to help him. Defendant testified that he went to Coggin Pontiac with Burnette and saw Burnette go through the fence and get the car. He followed Burnette to Chapel Hill Boulevard where they switched cars. Defendant then drove the car to Part Time Help Limited. He denied knowing that the car was stolen.

At the trial of this Case No. 79CRS28603 the defendant requested and the trial judge instructed the jury on the defense of entrapment. However, in instructing the jury initially, and later in instructing the jury on entrapment after the jury had asked the trial judge to repeat the definition of entrapment, the court instructed that the inducement had to come from one or some of the two police officers and two SBI agents who testified. The trial judge did not instruct that the inducement could come through someone acting as an agent for the officers (here Burnette). This the defendant cites as prejudicial error.

The defendant's theory of entrapment here is that the police induced an unwitting third party, Ricky Burnette, into becoming their agent for the purpose of persuading others to bring them stolen property and that Burnette persuaded the defendant, who was not otherwise so inclined, into helping him steal property. The defendant contends that his evidence showed that he was not otherwise disposed to commit the crime; that he was induced by Burnette to become involved; that Burnette through the financial manipulation of the police, became and was acting, although perhaps unwittingly, as an agent of the police; and that this evidence called for an instruction on the defense of entrapment by an agent. The defendant does not contend that entrapment must be found as a matter of law, but merely that his evidence was sufficient to justify the entrapment by agent charge.

In determining whether a defendant is entitled to raise the defense of entrapment, this Court employs a two-step analysis:

'Whether the defendant was entitled to have the defense of entrapment submitted to the jury is to be determined by the evidence. Before a Trial Court can submit such a defense to the jury there must be some credible evidence tending to support the defendant's contention that he was a victim of entrapment, as that term is known to the law.' *State v. Burnette*, 242 N.C. 164, 173, 87 S.E. 2d 191, 197 (1955). The

defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers or their agents to induce a defendant to commit a crime, (2) when the criminal design originated in the minds of the government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities. *Sherman v. United States*, 356 U.S. 369, 2 L.Ed. 2d 848, 78 S.Ct. 819 (1958); *State v. Stanley*, 288 N.C. 19, 215 S.E. 2d 589 (1975); *State v. Burnette, supra. In the absence of evidence tending to show both inducement by government agents and that the intention to commit the crime originated not in the mind of the defendant, but with the law enforcement officers, the question of entrapment has not been sufficiently raised to permit its submission to the jury. State v. Fletcher*, 279 N.C. 85, 181 S.E. 2d 405 (1971); *State v. Coleman*, 270 N.C. 357, 154 S.E. 2d 485 (1967); *State v. Burnette, supra.* (Emphasis added.)

*State v. Walker*, 295 N.C. 510, 513, 246 S.E. 2d 748, 749-50 (1978).

Interpreting the evidence most favorably to the defendant it reflects only that the officers encouraged people who transacted sales with them to encourage other people to bring goods to them, and that once they had enough evidence on a suspect, they did not offer him as much money (which might have caused the suspect to seek others to act for them on a commission basis). We conclude that this is not sufficient evidence to indicate that such suspects became agents of the police, although unwitting ones, and therefore "the question of entrapment is not sufficiently raised to permit its submission to the jury." This conclusion is dictated by our assessment of the law and the evidence on the two elements necessary to entitle defendant to an entrapment charge as set forth in *Walker*. These two elements of (1) inducement and (2) origin of intent bear repeating:

The defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers or their agents to induce a defendant to commit a crime, (2) when the criminal design originated in the minds of the government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities.

295 N.C. at 513, 246 S.E. 2d at 749-50.

Inducement:

[1, 2] While there is authority in a minority of other jurisdictions to the contrary, North Carolina follows the majority rule that entrapment is a defense only when the entrapper is an officer or agent of the government.[2] *State v. Jackson,* 243 N.C. 216, 90 S.E. 2d 507 (1955). *See State v. Whisnant,* 36 N.C. App. 252, 243 S.E. 2d 395 (1978); *State v. Yost,* 9 N.C. App. 671, 177 S.E. 2d 320 (1970); Criminal Law—A Survey and Appraisal of the Law of Entrapment in North Carolina, 54 N.C. L. Rev. 982 (1976); 21 Am. Jur. 2d, Criminal Law, § 202 (1981). It is defendant's contention, however, that he was induced to commit the crime through Burnette, and that Burnette was acting as an agent of the police, albeit unwittingly. It is not disputed that Burnette "induced" the defendant to commit the crime or that the defendant succumbed to the inducement. Our law is replete with examples of defendants who, but for the "inducement" of another, would not have committed the crime charged. They are not afforded the defense of entrapment. The threshold question, then, is whether our law includes in its definition of *agent* an unwitting third party who, presented with an opportunity to commit the offense by an undercover police officer, then induces defendant's participation in the offense without specific direction from the officer. Our appellate Courts have not passed on this precise question.

We find the phrase "unwitting agent" to be a contradiction in terms. An agent is "(a) person authorized by another to act for him." Black's Law Dictionary 59 (rev. 5th ed. 1979). An agency relationship must be created by mutual agreement. It cannot be created by one party *in invitum. Johnson v. Orrell,* 231 N.C. 197, 56 S.E. 2d 414 (1949). If the existence of an alleged agency relationship is unknown to the "agent," the "agent's" authority is without scope or definition—a situation which invites abuse and far-reaching legal ramifications. Thus, where the government

---

2. The federal courts have universally declined to permit the defense to be raised in cases where an "entrapment" was accomplished by a private person rather than a government agent. States which have made entrapment a statutory defense uniformly provide that the inducement must come from a Government officer or his agent, or a person acting "under the direction" of the officer. Park, The Entrapment Controversy, 60 Minn. L. Rev. 163 (1976).

denies that the entrapper is, in fact, its agent, the defendant is required to produce substantial credible evidence of an agency relationship. *State v. Yost,* 9 N.C. App. 671, 177 S.E. 2d 320. This he failed to do. Defendant offered no evidence at trial other than that Burnette, acting on the suggestion of law enforcement officers, encouraged others to sell stolen goods to the officers. The evidence before us shows that Burnette was acting solely with the objective of furthering his own economic interests. In short, Burnette needed an accomplice and the defendant was induced, as a willing candidate, to act in that capacity.[3]

Origin of Criminal Design:

"[W]hen the defense of entrapment is raised, defendant's predisposition to commit the crime becomes the central inquiry." *State v. Salame,* 24 N.C. App. 1, 10, 210 S.E. 2d 77, 83 (1974), *cert. denied,* 286 N.C. 419, 211 S.E. 2d 800 (1975). See *United States v. Russell,* 411 U.S. 423, 36 L.Ed. 2d 366 (1973). There is ample evidence before us disclosing that defendant was predisposed to commit the crime charged. He bragged to the undercover agents that he dealt in stolen cars, that he had inside contacts at Coggin Pontiac, and that he could get better and more expensive cars and other goods, etc.

Officer Raney testified with respect to this aspect of the transaction as follows:

> When I had examined the car, I came back inside at which time the defendant stated that he could get new Mercedes and Cadillacs.

---

3. The circumstances surrounding this particular "sting" operation suggest that Burnette's choice of the defendant was not based on a random selection of a theretofore nonpredisposed individual, but rather was based on facts known to him suggesting that defendant would participate willingly in the illegal activity.

> [T]here is little risk that a middleman will attempt to induce nonpredisposed persons to engage in crime when the middleman will receive no further reward for bringing additional people to the opportunity. For example, government agents occasionally establish a fictitious fencing operation to detect traffic in stolen property and, to inform the criminal community of their presence, form a network of middlemen simply by asking the fence's customers to tell their friends about the opportunity.

Note, Entrapment Through Unsuspecting Middlemen, 95 Harv. L. Rev. 1122, 1135 n. 66 (1982).

. . . .

When I re-entered the building I told the defendant that I would give him $400.00 for the car. He agreed to that. So I laid $400.00 on the counter, and Mr. Luster took the money. I don't know exactly how long this transaction took, probably ten minutes.

Mr. Luster said he could get new Mercedes and Cadillacs, that he had someone working with him. He didn't tell me specifically how he could get Mercedes or Cadillacs. He did not tell me how he got this particular automobile. I did not ask him how he did it. I wanted to ask him, but I didn't have the chance.

Agent Black, one of the undercover SBI agents, testified in this regard as follows:

Luster asked if we could handle several new cars and stated that he had access to new Dodges, Cordobas, Challengers, and that he had people working with him on the inside at the Dodge dealership just outside of Durham. He stated that he also might be able to bring us Mercedes and Cadillacs.

Officer R. D. Simmons of the Durham Police Department who was operating the video camera testified in part as follows:

I observed the two suspects enter through the front door of the operation, walk up to the counter where some conversation was held between the parties. Mr. Raney then left the operation and there was some conversation between the parties and Agent Black of the SBI. A few minutes later Officer Raney returned, there was discussion between the parties about the vehicle that was purchased by the undercover officers as well as a conversation held by Mr. Luster with regard to him being able to bring in some other cars, referring to Mercedes-Benz and Cadillacs. Officer Raney then placed approximately $400.00 on the counter which was recorded by the video camera and on the cassette tape. Mr. Luster picked the money, then the two suspects left the operation and the officers then made other transactions.

The following excerpts from the transcript of the videotape of the transaction verify the testimony of these witnesses:

LUSTER: Yeah, everybody calls me Buddy. Look, I want to know whether, you know, I could get back with you on something. 'Cause, like, I got access to the damn cars, right?

BLACK: Unh-hunh.

LUSTER: And, ah, if the money is right, man, I can get you any damn thing you want. To be frank about it.

BLACK: Well, we'll have to talk about what you want in the way of money.

LUSTER: Well, everything I'll be bringing will be new, see.

BLACK: Unh-hunh.

LUSTER: So what I really would like to do is I'd like to talk in terms of anywhere from five on up when you're talking about a brand new car.

BLACK: Well, depends on what it is.

LUSTER: Okay. Large cars. What are you saying, like Cadillacs, Mercedes.

BLACK: Yes.

LUSTER: Okay, I see what you (inaudible).

BLACK: Five usually is the very tops we can pay on anything, unless it's something real nice.

. . . .

AGENT: What kind of cars are you talking about?

LUSTER: Well, it'd be in the range of Dodge, or—Dodge, Cordoba, Challenger, or anything in that range.

AGENT: Some of those little Dodges? Imports? Like a Colt or something?

LUSTER: Yeah, well, it's a Charger.

BURNETTE: That's a Challenger.

LUSTER: Challenger.

. . . .

RANEY: You work at Coggins (inaudible).

LUSTER: No, I just got access to a lot of stuff (inaudible). I know some people out there.

RANEY: So you got some people that will help you?

LUSTER: Yeah, got some people that's helping me, is what I'm saying. So I wanted to get in touch with y'all and see what kind of business we could talk, really.

AGENT: We can do some business.

. . . .

LUSTER: Well, the way I be dealing with it, the car don't actually be hot, hot. See, it's like, ah, a car that has been rented before, and, like, the rental cars, they may have—may take upward of two months before they even do anything. Depends on whether they have to rent it out again. See what I'm saying? With this fleet, you know?

RANEY: So they don't even miss it?

LUSTER: Nah. Nah.

AGENT: Okay, that's cool. That's cool.

LUSTER: They won't miss it for two or three weeks, probably.

. . . .

LUSTER: Well, look, what kind of price are we talking on this one?

BLACK: Well, you've seen it, man. You tell him. I don't know.

RANEY: It's a nice little car. On a brand new one like that, I'd go four. Four hundred dollars.

LUSTER: Okay, sounds sweet.

RANEY: This is your first deal, so I'm going to do you right.

BLACK: We may not be able to go that high all the time.

RANEY: May not be able to go that high all the time. It's according to how things are going on the other end.

BLACK: And whenever anybody comes in down here for the first time and brings us something nice, you know, we try and do them right, you know.

LUSTER: When I come back, I'll probably have something nice (inaudible).

. . . .

LUSTER: Well, what I'm trying to tell you is this. Look, it may not be just this kind of car. See what I'm saying? It may be—yeah, I can get a Mercedes, any damn thing (inaudible).

BLACK: Hey, man, if you can bring us a Mercedes, we're in business.

LUSTER: What kind of price you talking about when you say—see, I like to know what price it is. That way, I can pick what I want (inaudible).

BLACK: We'll go a little higher than four on a Mercedes.

LUSTER: You'll go what, now?

BLACK: I'll go a little higher than four on a Mercedes. I would like to see it first, you know. I don't want to talk about price until I see the merchandise. See what I mean?

LUSTER: Okay.

AGENT: But if you can get a Mercedes in here, my man, we'll do some business.

LUSTER: Or a Cadillac?

AGENT: Or a brand new Cadillac. We want brand new ones.

LUSTER: Brand new, I don't mess with brand new ones. (Inaudible).

. . . .

AGENT: Man, you get us a Mercedes, a brand new Mercedes, we can do some good business with you.

LUSTER: Hey, man, that looks good to me.

(AGENT hands money to Luster.)

In support of his contention that he did not know the vehicle was stolen, defendant argues that his statements to the officers were not truthful; that at the behest of Burnette, he was merely "puffing" to impress them. We reject this argument. Defendant accepted from the officers a few hundred dollars for a relatively new automobile and then accepted from Burnette only a percentage commission of that amount. The facts belie the contention that he did not know before he entered Part Time Help Limited that the cars were stolen.

When a defendant's predisposition to commit the crime charged is demonstrated, the defense of entrapment is not available to him. *Hampton v. United States*, 425 U.S. 484, 48 L.Ed. 2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 36 L.Ed. 2d 366; *Sherman v. United States*, 356 U.S. 369, 2 L.Ed. 2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 77 L.Ed. 413 (1932).

It is true of course that the undercover agents provided the opportunity for defendant to make the sales. However, merely providing the opportunity for one predisposed to criminal conduct does not constitute entrapment. *See Sorrells v. United States*, 287 U.S. 435, 77 L.Ed. 413; *State v. Boles*, 246 N.C. 83, 97 S.E. 2d 476 (1957).

Based on the record before us, defendant was not entitled to have the defense of entrapment submitted to the jury. The fact that the trial court did so was favorable to the defendant and cannot be assigned as error. Defendant has not met his burden of proving either inducement or that the criminal design originated in the minds of government officials. There was no evidence of inducement by the law enforcement officers themselves. Nor do we accept defendant's argument that Burnette acted as an "unwitting agent" for the officers in inducing defendant's participation. In fact, the evidence negates the existence of any agency relationship. Defendant was not entitled to an instruction of entrapment by an agent. Finally, we find sufficient evidence negating defendant's theory that he was an innocent victim without predisposition to commit the crime.

While the question presented in the first case is whether defendant was entitled to an instruction on entrapment specifically by an agent of the police, the question presented in the second case is whether he was entitled to the general entrapment instruction.

### Case No. 79CRS22551

[3] In Case No. 79CRS22551 defendant was convicted of felonious larceny of a 1979 Pontiac. The material facts are substantially the same as those in Case No. 79CRS28603. The case arose from incidents occurring on 23 May 1979, the day after the events in Case No. 79CRS28603, and involved defendant's second visit to the sting operation. The State presented evidence from two employees of Coggin Pontiac that a man fitting defendant's description took the 1979 Pontiac that was stolen from Coggin Pontiac. Again the defendant delivered a stolen car to Part Time Help Limited, negotiated the sale of the car, and took $500.00 for it. This second transaction was also videotaped.

During this trial, defendant testified that before talking to Burnette, he had never had any desire to participate in any kind of stolen goods ring; that on 22 May, Burnette asked him to take a car to Part Time Help Limited; and that upon delivery of the car, the officers paid him $400.00 and asked him if he could bring some more cars. The next day, 23 May, he did return with another car. He admitted that he drove the car from the Coggin Pontiac lot to Part Time Help Limited. He carried the keys in and took $500.00 for the car. He received $85.00 as his percent. He denied knowing that the car was stolen.

The defendant requested that the jury be instructed on the defense of entrapment. The trial judge denied the defendant's request and gave no instruction to the jury on the defense of entrapment. The defendant cites this as prejudicial error.

Defendant contends that he was entitled to the basic entrapment instruction in this case (79CRS22551) for the same reasons he was entitled to it in the first case (79CRS28603). Because the evidence in the two cases is substantially the same, and having determined that defendant was entitled to neither an entrapment by agent instruction nor the general entrapment instruction in Case No. 79CRS28603, we need not repeat our reasoning in that

regard here. Defendant further contends, however, that there was inducement by the officers themselves in this case which was not present in the first. He argues that on the 22 May visit, during the course of negotiations between him and the undercover agent, the officer handed him money and asked him if he could bring some more cars.

Defendant bases this contention upon his own self-serving testimony in recounting the events of the 22 May transaction:

> On the 22nd day of May, 1979 I didn't discuss the price of that Challenger that I got from Coggin Pontiac with this officer. I think the price was set. I discussed the price with him. I got the money on that day, $400.00. This officer had asked did I have, could I bring him some more cars. I don't recall telling this officer that I could get many cars from Coggin.

Defendant's statement is not supported by the testimony of any other witness present, the transcript of the videotape, or the videotape itself. We need not repeat the evidence previously recounted herein of the events of the incident on May 22. That evidence overwhelmingly refutes defendant's contention.

It is clear from this review of the evidence that the undercover agents did not induce defendant to commit the crime charged. Simply put, in Case No. 79CRS22551 there is insufficient evidence to support an instruction on entrapment.[4] The trial court properly denied defendant's request for the same. Defendant's sole assignment of error in Case No. 79CRS22551 — the denial of his request for a general instruction on entrapment — is without merit.

The Court of Appeals found no error in the trial court's failure in Case No. 79CRS28603 to instruct on entrapment by an

---

4. We do not reach the question of whether defendant could properly raise the defense of entrapment under his plea of not guilty and upon his denial that he knew the vehicle was stolen. In North Carolina a defendant may properly raise the defense of entrapment under a plea of not guilty. But the defense is not available if the criminal act itself is denied. *State v. Neville*, 302 N.C. 623, 276 S.E. 2d 373 (1981). *See* 21 Am. Jur. 2d, Criminal Law, § 208 (1981); Annot., 5 A.L.R. 4th 1128 (1981). This Court has ruled that allowing a defendant to deny participation in a criminal *act* while claiming he was entrapped into committing the offense would be inconsistent, and has distinguished between denying *acts* and denying *intent*, which would not be inconsistent with entrapment.

State v. Luster

agent and in its denial of defendant's request for a general entrapment instruction in Case No. 79CRS22551. The decision of the Court of Appeals is

Affirmed.

Justice MARTIN took no part in the consideration or decision of this case.

Justice EXUM dissenting.

Believing, as did Judge Wells in the Court of Appeals, that there is sufficient evidence in Case No. 79CRS22551 of the agency of Ricky Burnette to require that the jury be instructed on entrapment by an agent of the government and in Case No. 79CRS28603, there is sufficient evidence of entrapment by an agent to require a charge on this defense, I respectfully dissent.

The state's evidence in both cases tended to show as follows: From November 1978 to August 1979 Durham Police and the SBI conducted, in the words of one officer, a "sting operation or undercover fencing operation" on Greer Street in Durham. The officers held themselves out as an employment agency named "Part Time Help Limited" (hereinafter Part Time). As one officer testified, the real "purpose of this operation was to get people to bring us stolen property." Persons who did so were videotaped and later charged with criminal offenses involving the stolen property which they brought in. One officer testified:

> As part of this operation, we encouraged people who came into our store to get other people to bring materials to us. When we had seen a fellow enough times and we had gotten them on tape enough times we did not exactly discourage them necessarily from coming back with the same item, we knew to not offer him quite as much money as we got into him. We would continue to suggest to these people that they bring other people around. When we talked to these people, we made it known that we would buy property from them. We would say we would buy quality property but we could not pay a whole lot for it. We wanted good merchandise but we could not pay a whole lot of money for it. We did not actually say stolen property.

This officer also acknowledged that by the time of the incidents involving defendant, 22 and 23 May 1979, Part Time had dealt with Ricky Burnette "quite a few" times; "[h]e was a regular. He had brought us cars before." The director of the operation testified that he had been present "on numerous times in the store when Ricky Burnette came in for one purpose or another." Another officer testified:

> It was a part of my work in this investigation to get as many people involved in this fencing operation as possible. We told people who brought in property if they knew anyone else who had any merchandise that they wished to sell, for them to come in and we would discuss purchasing the merchandise from them. One of these people that I spoke to in this fashion was Ricky Burnette.

Again, an officer said:

> Ricky Lamont Burnette came into the store with Mr. Luster. I had seen Mr. Burnette on several occasions prior to this time. I had told Mr. Burnette that we would buy property.
>
> When we told these people that we would buy property, we just said property, we wanted quality property and we couldn't pay much for it. We didn't make that statement to all the individuals who came in our store.
>
> . . . .
>
> I either told or someone to the best of my knowledge advised Mr. Burnette that property could be bought there for money.

In Case No. 79CRS28603, tried before Judge Godwin, the state's evidence also tended to show that on 22 May 1979, defendant sold to Part Time a 1979 Dodge Challenger, which had been stolen on 22 May from Coggin Pontiac, for $400. In Case No. 79CRS22551, tried before Judge Clark, the state's evidence tended to show that on 23 May 1979, defendant sold to Part Time a 1979 Pontiac Grand Prix, which had been stolen on 23 May from Coggin Pontiac, for $500. On both occasions defendant was accompanied by Ricky Burnette.

In both cases defendant testified in his own defense and offered in corroboration the testimony of Ricky Burnette. Their testimony tended to show the following:

The officers at Part Time told Burnette in May 1979 they didn't want to buy any more cars from him. They asked him to bring someone else "down there with the cars." Burnette then contacted defendant, whom he had known five or six months, and requested defendant to help him take cars from Coggin Pontiac to Part Time. On both occasions Burnette himself actually took the cars from Coggin's lot and defendant observed Burnette talking with someone at Coggin before Burnette took the cars. After they left Coggin, defendant at Burnette's request drove the cars to Part Time where defendant negotiated the sales in the presence of Burnette. The two then left Part Time and Burnette paid defendant a "commission" for driving the cars and negotiating the sales. Defendant's "commission" on 22 May was $60 and on 23 May, $85.

Burnette suggested that defendant, who was unemployed, might get a job with Part Time if the people there were sufficiently "impressed" with him. Defendant bragged about his ability to deliver expensive cars in his negotiations with Part Time because Burnette instructed him to do this. Defendant did not know that the cars were stolen. Both transactions originated entirely in the mind of Burnette and defendant's participation was entirely at Burnette's suggestion. Defendant said: "Prior to talking with Mr. Burnette . . . I had never had any desire to participate in any kind of stolen goods ring." Defendant was twenty-three years old in May 1979 and had not been in any difficulty with the law since he was "sixteen or seventeen" when he was convicted of misdemeanor breaking and placed on probation.

In Case No. 79CRS28603 involving the 22 May transaction, Judge Godwin charged the jury generally on the defense of entrapment, but he limited the jury's consideration to actions by law enforcement officers themselves who were operating Part Time. He did not instruct the jury that defendant could be entrapped by the actions of Burnette acting as an agent for these officers. Defendant was convicted in this case of felonious possession of stolen property and sentenced to a maximum of six years' imprisonment. In Case No. 79CRS22551 involving the 23 May

transaction, Judge Clark refused to give instructions relating to the entrapment defense, even though defendant made a timely request that such instructions be given. Defendant was convicted of larceny of a motor vehicle and sentenced to not less than six nor more than ten years' imprisonment. His sentence for the 22 May transaction, Case No. 79CRS28603, was to begin at the expiration of the sentence imposed in Case No. 79CRS22551.

Defendant's argument that Judge Godwin erred by not instructing on entrapment by an agent of the officers and that Judge Clark erred by not instructing on entrapment at all is cogently and succinctly stated in his brief:

> The police induced an unwitting third party into becoming their agent for the purpose of persuading others to bring them stolen property. This third party, who was Ricky Burnette, persuaded the defendant, who was not otherwise so inclined, into helping him steal property. The defendant was, therefore, entitled to a jury instruction on entrapment by an agent of the police.

Entrapment may occur through actions of "law enforcement officers *or their agents*." *State v. Walker*, 295 N.C. 510, 513, 246 S.E. 2d 748, 749-50 (1978) (emphasis supplied). The principal question argued in the briefs is whether a private citizen like Burnette can in law be an agent of the police when he acts for them and at their direction, unaware of their true identity but believing them to be private citizens, so that a defendant induced to commit a crime by such a person can raise the defense of entrapment. The majority avoids directly addressing this question by concluding (1) even if Burnette were an agent of the police, there is no evidence that Burnette entrapped defendant because all the evidence showed defendant to have been predisposed to commit the crimes charged and these crimes originated in defendant's mind, rather than Burnette's, and (2) there is no evidence of an agency relationship between the police and Burnette because all the evidence shows that Burnette was acting in furtherance of his own interest and not at the direction or authorization of the police. I disagree with both conclusions; furthermore, I believe that a person like Burnette can be an agent of the police for purposes of the entrapment defense even if he does not know that his principals are police officers.

It is important to note that defendant does not contend that all the evidence in the case shows, as a matter of law, that he was entrapped. He argues only that there is some evidence in both cases from which a jury could conclude that he was entrapped by the actions of Burnette and that Burnette was then acting as an agent of the police. Defendant contends also that Burnette's unawareness that the persons for whom he acted were police officers does not preclude the existence of an agency relationship. I think defendant's assessment of both the evidence and the law is correct.

Whether a defendant is entitled to have the defense of entrapment submitted, absent questions of agency, is governed by well-established rules set out in *State v. Walker*, 295 N.C. 510, 513, 246 S.E. 2d 748, 749-50 (1978):

'Whether the defendant was entitled to have the defense of entrapment submitted to the jury is to be determined by the evidence. Before a Trial Court can submit such a defense to the jury there must be some credible evidence tending to support the defendant's contention that he was a victim of entrapment, as that term is known to the law.' *State v. Burnette*, 242 N.C. 164, 173, 87 S.E. 2d 191, 197 (1955). The defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers *or their agents* to induce a defendant to commit a crime, (2) when the criminal design originated in the minds of the government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities. [Emphasis supplied.]

In *State v. Burnette*, 242 N.C. 164, 169, 87 S.E. 2d 191, 194 (1955), this Court discussed the defense of entrapment as follows:

It is the general rule that where the criminal intent and design originates in the mind of one other than the defendant, and the defendant is, by persuasion, trickery or fraud, incited and induced to commit the crime charged in order to prosecute him for it, when he would not have committed the crime, except for such incitements and inducements, these circumstances constitute entrapment and a valid defense. [Citations omitted.]

In the leading case of *Butts v. U.S., supra* [273 F. 35 (1921)], *Sanborn, C.J.,* said for the Court: 'The first duties of the officers of the law are to prevent, not to punish, crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.'

A clear distinction is to be drawn between inducing a person to commit a crime he did not contemplate doing, and the setting of a trap to catch him in the execution of a crime of his own conception. *S. v. Jarvis, supra* [105 W.Va. 499, 143 S.E. 235 (1928)]; *S. v. Mantis,* 32 Idaho 724, 187 P. 268; 15 Am. Jur., Criminal Law, p. 24; 22 C.J.S., Crim. Law, pp. 100-101.

The essence of entrapment, then, is the inducement by law enforcement officers or their agents of a person to commit a crime when, but for the inducement, that person would not have committed the crime.

If one assumes for purposes of this argument that Burnette was an agent of the police and they are therefore bound by his actions as an agent, there is plenary evidence that but for the importuning of Burnette, defendant would not have committed the crimes for which he was convicted. Defendant's evidence tended to show that Burnette persuaded defendant to help Burnette transport the automobiles from Coggin Pontiac to Part Time; the idea was Burnette's alone; before Burnette approached him, defendant had no desire to participate in illegal activities; and defendant had not engaged in any criminal activity for about six years.

The majority concludes, however, that all the evidence shows defendant was predisposed to commit these crimes; therefore the defense of entrapment is not available to him. The majority rests this conclusion largely on defendant's tape-recorded conversations with the officers at Part Time. These statements were made, of course, *after* the thefts were committed. While they may be some evidence of defendant's state of mind before the thefts, the logical connection is a weak one. Further, and most important, according to Burnette and defendant, defendant engaged in this conversation at the instructions of Burnette in an effort to please those with whom he dealt at Part Time so that he could obtain more

money for the vehicles and be given further opportunity to make similar deliveries.

Defendant also testified that he did not know the automobiles were stolen. This, in itself, is some evidence that he was not predisposed to steal them. The credibility of all this evidence is, of course, for the jury. Insofar as other evidence tends to show that defendant was predisposed, the evidentiary conflict should be resolved by the jury.

Defendant's six-year-old misdemeanor conviction does not show a predisposition to commit the crimes involved. *See Sherman v. United States*, 356 U.S. 369 (1958); *State v. Stanley*, 288 N.C. 19, 32-33, 215 S.E. 2d 589, 598 (1975).

There is no evidence that Burnette was told to approach this particular defendant or that Burnette knew that the persons at Part Time were law enforcement officers. Under these circumstances the courts are divided on whether a person like Burnette can be an agent of the officers for purposes of the entrapment defense. *See* Note, *Entrapment Through Unsuspecting Middlemen*, 95 Harv. L. Rev. 1122 (1982); Note, *Entrapment: An Analysis of this Agreement*, 45 B.U.L. Rev. 542, 563-65 (1965). The better reasoned view is that persons like Burnette can be an agent of law enforcement officers whereby defendants are entrapped.

> The defense of entrapment should not be withheld . . . merely because the third party inducer was unaware that he was being used by the government for law enforcement purposes. The mental processes of the third party inducer have little relevance to the inquiry for, wittingly or unwittingly, he may be an agent of the government, and it is therefore his actions and the mental processes and predisposition of the allegedly otherwise innocent defendant which bear scrutiny.
>
> Likewise, because the unwitting third party is not directed to purchase morphine from, a *particular* individual, the government should not be allowed to avoid responsibility for the third party's actions. True, the third party may be classified as a free agent with regard to whom he approaches . . . . Nevertheless, it is foreseen by the government in each such instance that he must approach someone. Since it is the

very purpose of the government that he do so in order to prosecute the person approached, the government should not be allowed with immunity to delegate the determination of whom to approach. Where a third person under these circumstances has induced another to participate in the crime, the government is the direct and foreseeable cause of this participation. The likelihood that this defendant is otherwise innocent is equally as great as, or no less than, where the government directed the third person to a particular individual. Accordingly, the defense of entrapment should be equally available.

Note, *supra*, 45 B.U.L. Rev. at 564-65.

Essentially, the same position is taken in an excellent Harvard Law Review Note which, after analyzing the application of the entrapment doctrine to undercover "sting" operations, calls upon the courts to "recognize that government responsibility for inducing persons not otherwise disposed to commit criminal acts is not attenuated by the fact that the offense is committed upon the immediate prompting of an unsuspecting intermediary." Note, *Entrapment Through Unsuspecting Middlemen*, 95 Harv. L. Rev. 1122, 1140 (1982). As the Court said in *People v. McIntire*, 23 Cal. 3d 742, 748, 591 P. 2d 527, 530 (1979): "Improper governmental instigation of crime is not immunized because it is effected indirectly through a pliable medium."

Our Court of Appeals has adopted this view in *State v. Whisnant*, 36 N.C. App. 252, 243 S.E. 2d 395 (1978). There defendant was convicted of selling a controlled substance. Ms. Reynolds, defendant's friend, called defendant and told her that she had a friend who needed drugs. Ms. Reynolds' friend was an undercover SBI agent by the name of Prilliman. There is nothing in the Court of Appeals' decision to indicate that Ms. Reynolds was aware that Prilliman was an SBI agent. The Court of Appeals concluded that the evidence "tends to show some inducement of defendant by Ms. Reynolds as the agent of Prilliman to commit the crime." The court said, 36 N.C. App. at 254, 243 S.E. 2d at 396-97:

Under these circumstances it was the duty of the trial judge . . . to apply the law to the evidence by instructing the jury in substance that if Ms. Reynolds was acting as an agent for S.B.I. Agent Prilliman and she as such agent induced the

defendant to commit the crime charged, the S.B.I. agent would be responsible for her actions and the defense of entrapment would be available to defendant. *Sherman v. United States*, [356 U.S. 369 (1958)].

I do not understand the majority to take a contrary position on this question.

The majority concludes simply that there is no evidence of an agency relationship between Burnette and the police at Part Time. The majority says there is no evidence of any mutual understanding between them, *i.e.*, no evidence that police authorized Burnette to act with regard to defendant and no evidence that Burnette in turn willingly acted pursuant to such authorization.

I disagree. There is evidence from which a jury could find that Burnette, when he dealt with defendant, did so as an agent of the police officers who were operating Part Time. It is true that, according to the officers' testimony, they never used the words "stolen property" in their conversations with Burnette. Nevertheless the state's evidence was that the "purpose of this operation was to get people to bring us stolen property" and that the officers encouraged regular customers like Burnette, who the officers knew to be thieves and who, in turn, knew that Part Time would buy stolen property, to solicit others to deal with Part Time. The officers' conversations with Burnette were designed to, and in effect did, direct him to tell others that Part Time was a fence for stolen property. The conversations were designed to, and in effect did, direct Burnette to get others not only to bring in the property which had already been stolen but also to steal property for which Part Time would provide an outlet. Burnette testified that the officers first persuaded him to steal cars and to bring them to Part Time. One officer even accompanied him on his first theft. After he had delivered a number of stolen cars to Part Time, the officers told him they would not buy more cars from him and directed him to "bring somebody else down there with the cars." Burnette testified in Case No. 79CRS22551:

> They [the officers at Part Time] contacted me . . . . They told me over the phone they had some work for me to do. So, I went down there . . ., and they told me they

wanted me to deliver a car, and I went to K-Mart. Officer Raney told me they wanted me to deliver a car.

We went to K-Mart parking lot. He got some Virginia tags out of his personal car, put them on a Chevrolet Impala, no a Caprice. Then he asked me which car did I want to drive. So, I got out of his car and I went, I followed him to Oxford, . . . we met a man up there. The man shined the light on the car and everything and after they transacted the business we left there. On the way back he asked me how much money did I think he got for the car. I said that I don't know, and he said, well you take anything, you know, car, gun, t.v., so and so on.

After this was told to me, I made many more trips to Part Time. I brought them automobiles.

They told me not to bring anything there, that they didn't want anything from me . . . sometime in May, 1979. They told me they didn't want any more cars from me. They indicated to me that I should go out and advise people about the availability of Part Time and the services that they offered. Most every time I went there they told me to bring somebody else down there new that wanted a little extra money.

After they told me they wouldn't take anymore [sic] cars from me, I approached someone else for the purpose of taking cars down there so that I could get money. That was Mr. Luster.

Burnette testified in Case No. 79CRS28603:

I am familiar with the gentlemen who were working behind the counter at Part Time. I see them here in the courtroom. These gentlemen told me that they weren't going to buy any more material from me. They told me this before I had gotten in contact with Mr. Luster. They told me that they weren't dealing with anymore cars, but what it was that they didn't want to buy no more cars from me. They wanted me to bring more people, bring somebody else down there with the cars. This is when I went to see Mr. Luster.

When I went to see Mr. Luster I told him I had a job over at Part Time. Mr. Luster told me that he was looking for work. I did not tell him what was involved in the job.

Clearly this is evidence from which a jury could find that the officers at Part Time directed and authorized Burnette to go out and get other people to do the same thing he was doing, i.e., stealing automobiles and other personal property and bringing them to Part Time to sell. Pursuant to this direction and authorization Burnette induced defendant to commit the thefts charged against him in this case.

Finally, since defendant admitted his actions in obtaining and delivering the stolen vehicles to Part Time, defendant's denial of knowledge that the vehicles were stolen does not render the defense of entrapment unavailable. Only where a defendant denies all participation in the criminal activity can he not avail himself of the defense of entrapment. *State v. Neville*, 302 N.C. 623, 276 S.E. 2d 373 (1981). The Court noted in *Neville* that: "The entrapment defense is not inconsistent with the defense of lack of mental state since the defense of entrapment itself is an assertion that it was the will of the government, and not of the defendant, which spawned the commission of the offense." *Id.* at 626, 276 S.E. 2d at 375.

I am cognizant of the need for undercover "sting" type operations in ferreting out crime. So long as these operations merely provide opportunity for persons predisposed to criminal activity to engage in it and be "stung," I applaud the officers for their energy and ingenuity. An operation, on the other hand, that encourages and incites criminal activity on the part of people who would otherwise have refrained from such activity has no place in the law enforcement arsenal. "The first duties of the officers of the law are to prevent . . . crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting . . . it." *State v. Burnette, supra*, 242 N.C. at 169, 87 S.E. 2d at 194 (quoting *Butts v. U.S.*, 273 F. 35, 38 (1921)), *quoted with approval* in *State v. Stanley, supra*, 288 N.C. at 28-29, 215 S.E. 2d at 595. As Justice Harlan wrote in *Lopez v. United States*, 373 U.S. 427, 434 (1963): "The conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. Such conduct, of course, is far different

from the permissible stratagems involved in the detection and prevention of crime." (Emphasis original.) Specifically, "sting" operations such as the Part Time investigation must serve only to detect criminal activity and not instigate it.

> The function of undercover investigation is to bring these hidden activities under control by detecting persons who are engaging in such a course of conduct or by 'predetecting' the crimes of persons who would commit them if presented with a favorable opportunity. However, law enforcement tactics that seek to induce persons who are not predisposed to crime to engage in criminal activity are intolerable for two reasons. First, individuals have a strong interest in privacy: law-abiding people should be left alone by the government. Second, law enforcement resources are wasted when the subjects of investigation are not predisposed to commit crimes. Governmentally created opportunities to engage in an illegal activity should therefore be designed to detect and apprehend only those who are predisposed to commit a similar offense.

Note, *supra*, 95 Harv. L. Rev. at 1130-31 (footnotes omitted). I fear, in light of the officers' own admissions, that although Part Time was intended to be merely a trap for the unwary criminal, it was instead infected with so much incitement and encouragement of criminal activity that defendant, not predisposed to crime (if his evidence is believed), was induced to engage in it.

Defendant is entitled in both cases to instructions on his defense that he was entrapped by Burnette acting as an agent of the police. I vote, therefore, that defendant be afforded new trials in both cases.

Justice CARLTON joins in this dissent.