STATE OF NORTH CAROLINA v. ERIC SCOTT REDMON

No. COA03-895

(Filed 1 June 2004)

**Motor Vehicles— impaired driving—entrapment**

The failure to give a requested instruction on entrapment resulted in the reversal of a driving while impaired conviction where a defendant was found sleeping in a truck, there was evidence that he had been drinking but not driving and did not intend to drive, defendant had a conversation with an officer in which he may have been told to move along, and the officer arrested defendant as he drove away.

Appeal by defendant from judgment entered 20 February 2003 by Judge Zoro J. Guice, Jr., in Buncombe County Superior Court. Heard in the Court of Appeals 22 April 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General Isaac T. Avery, III, and Assistant Attorney General Patricia A. Duffy, for the State.*

*Cloninger, Lindsay, Hensley & Searson, P.L.L.C., by Stephen P. Lindsay, for defendant-appellant.*

LEVINSON, Judge.

Defendant (Scott Redmon) appeals from conviction and judgment of driving while impaired. He argues on appeal that the trial court committed reversible error by denying his request to instruct the jury on the defense of entrapment. We agree and reverse.

The trial testimony tended to show the following: During the early morning hours of 30 March 2002, Deputy Brian Styles of the Buncombe County Sheriff's Department was patrolling the southern part of Buncombe County. At around 4:15 a.m. he was dispatched to the Glenn Shelton apartments to investigate an anonymous report that a man was sleeping in a truck parked at the apartment complex. Upon arriving at the apartment parking lot, Styles identified the truck that had been described to him. The truck was parked and its engine was turned off. He ran a license plate check which showed that the truck was not stolen or otherwise implicated in criminal activity. Styles then knocked on the truck window and awakened the defendant, who was asleep in the truck's front seat. He ran a computer check

of defendant's drivers license and determined that defendant had no outstanding warrants.

Styles testified at trial that when he woke up the defendant he "notice[d] that he had been drinking" and that the defendant smelled strongly of alcohol, appeared sleepy, and had red, glassy eyes. When questioned, the defendant told Styles he had been drinking alcoholic beverages that night, and explained that he was waiting for a friend who lived at the apartments to return home. Styles testified that he told defendant to see if his friend was home yet, so he would not have to drive in his condition. He denied telling the defendant to "move along" or otherwise suggesting that he drive.

Styles left the parking lot and briefly patrolled the immediate area, then returned to the intersection next to the apartment complex. Very shortly thereafter, Styles saw a truck leave the parking lot. He testified that he did not know it was defendant's truck, and that he stopped the truck because it was exceeding a safe speed. After administering a roadside Alcosensor test, Styles arrested defendant for exceeding a safe speed and suspicion of DWI, and called the North Carolina Highway Patrol to send a trooper with a license to operate an Intoxilyzer 5000 instrument.

On cross-examination, Styles acknowledged that defendant was doing nothing illegal in the parking lot and had cooperated with all of his requests. The officer agreed that he had no grounds to arrest defendant arising out of their interaction in the parking lot. He also conceded that there was "limited traffic if any" on the stretch of road where he was stopped when he saw defendant leave the parking lot, and that he arrested defendant no more than seven to ten minutes after arriving at the apartment parking lot. Styles denied parking out of sight and turning off his headlights to wait for defendant to leave the parking lot. He also denied recognizing defendant's truck before he pulled it over, or approaching defendant's truck with his Alcosensor instrument already in hand.

Trooper Denman of the North Carolina Highway Patrol testified that an Intoxilyzer 5000 test performed on defendant revealed a blood alcohol level of .10. In his opinion, defendant was clearly "unfit to drive" and his impairment was "obvious."

Defendant testified that he was 33 years old and a lifetime resident of Buncombe County, and that he had no criminal convictions. He owned an electrical, refrigeration, heating and air conditioning

contracting business. On 30 March 2002 defendant went to his girl-friend's apartment after work, and they agreed to go out separately with friends, then meet later at her apartment. Accordingly, a friend of defendant's, Mark Guice, picked him up at his girlfriend's apartment. Defendant and Guice left defendant's truck at the apartment, and went to a local restaurant for supper. Thereafter, they went to a bar where defendant had four or five large beers. Defendant did not do any driving while he and Mark were out. At around 11:30 p.m. Guice drove defendant back to the apartment complex where his girl-friend lived. However, she was not home yet and defendant could not reach her by cell phone. Realizing he was too intoxicated to drive, defendant decided to wait in his truck until his girlfriend returned home. At some point during this vigil defendant fell asleep in the truck. He was awakened by Styles opening his truck door, which "kind of scared" him. Styles asked to see defendant's identification, and told him there had been a "complaint" about a man sleeping in a truck. Defendant gave Styles his drivers' license, and explained to the officer that he had fallen asleep while waiting for his girlfriend to get home. When questioned by Styles, defendant told the officer he had been drinking earlier that night. Defendant testified that Styles never suggested that he check to see if his girlfriend had gotten home yet. Instead, Styles told the defendant that he could not remain in the parking lot, and directed him to "move along." After talking with defendant, Styles drove out of the parking lot.

It was then 4:30 a.m., with a "moderate rain" falling and standing water on the roads. The defendant lived 30 miles from the apartment. He took a few minutes to wake up more fully before starting his truck and leaving. Defendant testified that until the officer instructed him to "move along" he had no intention of driving because "I knew I couldn't drive, so I didn't drive. I have too much at stake[.]" He testified that he would never have driven that night if Styles had not woken him up and told him he had to leave the parking lot.

Defendant testified that he drove out of the parking lot about four or five minutes after Styles woke him up. As he was pulling onto the road, he saw a Buncombe County Sheriff's Department car stopped on the side of the road. His truck windows were fogged, so he rolled them down to get a better look. But, when he looked again, the ve-hicle had "backed out of [his] sight" and was "sitting dead still with no headlights on." Defendant testified that at the time "I thought nothing of it, because the guy told me to leave, I'm leaving[.]" He denied driv-ing in excess of the speed limit. However, just a few seconds after

defendant entered the roadway, Styles signaled with his blue light for defendant to stop. Defendant pulled over, and Styles approached his car holding the Alcosensor device.

Mark Guice testified that he was a friend of defendant's and that they had spent the evening of 30 March 2002 together. Guice corroborated defendant's testimony that when he picked up defendant at his girlfriend's apartment, they left defendant's truck locked up and went out to a local bar and restaurant. Guice did all of the driving during the evening. After he took defendant back to the apartment, defendant said he would wait in his truck for his girlfriend to come home.

Lori Peak testified that she worked for a local law firm that had previously represented defendant on the current charges. Prior to trial in district court, she had interviewed Officer Styles and Trooper Denham. Styles stated to Peak that he told defendant he had to leave the parking lot because he wasn't a resident of the apartment complex, and that he directed defendant to "move along" after defendant told him that he had been drinking. He also told Peak that he recognized the defendant's truck when it pulled out of the parking lot; and that because he already knew defendant was drunk, he had the Alcosensor instrument in hand when he approached defendant's truck. Trooper Denham told Peak that he had spoken with Styles, who shared with Denham that he told defendant to leave the parking lot, and that when the defendant said he should not drive because he had been drinking, Styles had told defendant "he still had to leave, to drive anyway, that he was okay to drive."

During the charge conference, defendant's request for a jury instruction on the defense of entrapment was denied by the trial court. Defendant renewed his request after the jury instructions were delivered, which was also denied. The jury began its deliberations, which continued until the jury returned to the courtroom with the following question:

> FOREPERSON: The question is if the jury sees evidence of entrapment and bird-dogging and/or finds the deputy guilty of these things, should that weigh or carry—impact our decision as to whether the Defendant is guilty of DWI?

> THE COURT: I say to you and the jury that you have heard the evidence for the State and the evidence for the Defendant. And the function of the jury is to find the facts from the evidence pre-

sented and to apply to those facts the law which the Court has given you. And the Court has given you its instructions.

Thereafter, the jury returned a verdict of guilty of impaired driving and not guilty of driving too fast for conditions. Defendant received a suspended 60 day sentence and was placed on unsupervised probation as a Level V offender. From this judgment and conviction, defendant appeals.

Defendant argues on appeal that the trial court erred by refusing to instruct the jury on the defense of entrapment. We agree.

"The law . . . forbids convictions that rest upon entrapment." *United States v. Jimenez Recio*, 537 U.S. 270, 276, 154 L. Ed. 2d 744, 750 (2003) (citing *Jacobson v. United States*, 503 U.S. 540, 118 L. Ed. 2d 174 (1992)). "Entrapment is a complete defense to the crime charged." *State v. Branham*, 153 N.C. App. 91, 100-01, 569 S.E.2d 24, 29 (2002). In general:

> [t]he defense of entrapment consists of two elements: (1) acts of persuasion, trickery or fraud carried out by law enforcement officers or their agents to induce a defendant to commit a crime, (2) when the criminal design originated in the minds of the government officials, rather than with the innocent defendant, such that the crime is the product of the creative activity of the law enforcement authorities.

*State v. Walker*, 295 N.C. 510, 513, 246 S.E.2d 748, 749-50 (1978) (citation omitted).

To be entitled to an instruction on entrapment, the defendant must produce "some credible evidence tending to support the defendant's contention that he was a victim of entrapment, as that term is known to the law." *State v. Burnette*, 242 N.C. 164, 173, 87 S.E.2d 191, 197 (1955) (citation omitted). The issue in this case is whether defendant met the burden of production of "some credible evidence" that his driving while impaired was the result of entrapment. "This burden acts as a screening device. It serves to prevent the defendant from obtaining instructions on defenses supported by mere conjecture or speculation but is not intended to be so rigorous as to keep the jury from receiving instructions on and deciding defenses for which supporting evidence exists." JOHN RUBIN, THE ENTRAPMENT DEFENSE IN NORTH CAROLINA, § 6.2(b) (Institute of Government, University of North Carolina at Chapel Hill, 2001).

Moreover, "[t]he issue of whether or not a defendant was entrapped is generally a question of fact to be resolved by the jury." *State v. Collins*, 160 N.C. App. 310, 320, 585 S.E.2d 481, 489 (2003), *aff'd* 358 N.C. 135, 591 S.E.2d 518 (2004) (citing *State v. Worthington*, 84 N.C. App. 150, 157, 352 S.E.2d 695, 700 (1987)). Thus, "[i]f defendant's evidence creates an issue of fact as to entrapment, then the jury must be instructed on the defense of entrapment." *State v. Branham*, 153 N.C. App. 91, 100, 569 S.E.2d 24, 29 (2002). Further, "[a] defendant is entitled to a jury instruction on entrapment whenever the defense is supported by defendant's evidence, viewed in the light most favorable to the defendant. The instruction should be given even where the state's evidence conflicts with defendant's." *State v. Jamerson*, 64 N.C. App. 301, 303, 307 S.E.2d 436, 437 (1983) (citation omitted).

In appropriate factual circumstances, the defense of entrapment is available in a DWI trial. *See State v. Crouch*, 42 N.C. App. 729, 730, 257 S.E.2d 646, 647 (1979) ("trial judge submitted the issue of entrapment to the jury" in defendant's trial for DWI). However, as in other cases, the defendant must produce some evidence of both inducement and lack of predisposition before he is entitled to a jury instruction on entrapment. Thus, in *State v. McCaslin*, 132 N.C. App. 352, 511 S.E.2d 347 (1999), this Court upheld the trial court's refusal to instruct on entrapment on these facts: the defendant left the scene of an automobile accident and later returned in a car driven by a friend. The law enforcement officer investigating the accident informed defendant that he needed to see the truck that was involved in the accident. Only later, after defendant returned to the scene driving the truck, did the officer realize that defendant was intoxicated. This Court held that defendant was not entitled to an instruction on entrapment because (1) there was no evidence that the officer knew defendant was intoxicated when he instructed him to bring his truck back to the accident scene, and (2) there was no indication that the officer directed the **defendant** to drive, inasmuch as he was being driven by a friend when he first encountered the officer. Similarly, in *State v. Bailey*, 93 N.C. App. 721, 379 S.E.2d 266 (1989), there was evidence that the defendant, who was visibly intoxicated, approached a law enforcement officer directing traffic at the Charlotte Motor Speedway and asked the officer for assistance in locating his truck. This Court held that the officer's response to defendant's request—he merely indicated the general area where defendant's vehicle was likely parked—did not constitute evidence supporting an entrapment instruction at defendant's DWI trial.

The facts of the instant case are easily distinguishable from those of *McCaslin* and *Bailey*. Regarding defendant's lack of predisposition to drunk driving, evidence was presented from which the jury could find that: (1) on 30 March 2002 defendant left his truck at the apartment when he and Guice went out; (2) Guice did all the driving that evening; (3) after returning to the apartment, defendant stated he would wait in the truck until his girlfriend returned; (4) when Styles arrived at the parking lot, defendant was asleep in the truck with the engine turned off; and (5) defendant testified that he would never have driven after drinking if Styles had not awakened him and told him to "move along" and leave the parking lot. We conclude that there was sufficient evidence of defendant's lack of predisposition to drive while impaired to warrant an instruction on entrapment. Regarding inducement, evidence was presented from which the jury could find that: (1) in response to an anonymous call, Styles went to the apartment complex to check on the circumstances of a man reportedly sleeping in a truck; (2) when Styles woke up defendant he immediately observed obvious signs that defendant was impaired; (3) when questioned, defendant told Styles he had been drinking, and explained that he was just waiting for his girlfriend to get home; (4) defendant fully cooperated with Styles' requests; (5) Styles told defendant he could not wait in the parking lot and directed him to "move along"; (6) after Styles drove out of the parking lot, he stayed in the general area of the apartment complex; (7) a few minutes later, when defendant left the apartment parking lot, Styles's patrol vehicle was hiding out of sight with its lights off, at the intersection next to the apartments; and (8) as soon as defendant started driving, Styles pulled him over and approached defendant's truck carrying an Alcosensor device. We find this sufficient evidence of inducement to commit the offense of DWI to entitle defendant to an instruction on entrapment.

This evidence, if believed, would tend to show that defendant was not predisposed to drive while impaired; that Styles knew that defendant was impaired; that although defendant may not have been doing anything illegal, Styles directed defendant to leave the parking lot and "move along"; that at 4:30 a.m. in rainy weather Styles knew that driving was likely defendant's only realistic means of "moving along"; that Styles lingered in the area of the apartment complex after telling defendant to leave; that when defendant left the lot Styles was waiting in the dark with his vehicle lights turned off; and that as soon as defendant drove away Styles immediately arrested him for DWI. We conclude that on the facts presented in this case, defendant was

entitled to an instruction on entrapment, and that the trial court erred by denying defendant's request for this jury instruction.

Under N.C.G.S. § 15A-1443 (a) (2003), a criminal defendant is prejudiced by non-constitutional errors "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" In the present case, defendant's evidence was substantial. Moreover, the jury's question for the trial court illustrates that even without an instruction on entrapment, the jury found that the defense might be an issue in the case. We conclude that the failure to instruct the jury on entrapment was prejudicial and requires a

New Trial.

Judges McCULLOUGH and HUDSON concur.